Kevin LoVUOLO and Antonio Musto,
Plaintiffs, Appellants,

v.

John GUNNING and Elaine Gunning,
Defendants, Appellees.

No. 90–1632.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1990.

Decided Feb. 7, 1991.

Andre R. Sigourney, for plaintiffs, appellants.

Keith W. Kauppila, with whom Bertram E. Snyder and Looney & Grossman were on brief, for defendants, appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is an appeal from a district court judgment entered on June 15, 1990, affixing joint liability and damages in an admiralty case. The case arose from an August 1988 collision between two power-driven pleasure boats in Boston Harbor.

## I

The district court's Findings of Fact, Rulings of Law and Order for Judgment set forth the following facts, which we do not disturb: During the evening of August 22, 1986, the parties were aboard their respective pleasure boats cruising Boston harbor. Defendant John Gunning, with five passengers aboard, was at the wheel of his 32–foot twin-screw cabin cruiser. His wife and co-owner of the vessel, defendant Elaine Gunning, was not aboard at the time of the accident. Gunning was proceeding at approximately 10 knots heading into the inner harbor in the main ship channel opposite Castle Island. His running lights, cabin lights and exterior "courtesy lights" were on.

At the same time, Plaintiff Kevin LoVuolo was operating his vessel, an open 23–foot speedboat. Plaintiff Antonio Musto was one of five passengers aboard. LoVuolo was proceeding at approximately 10 knots out of the inner harbor on the airport side of the main ship channel. He assumed a course at an angle to the line of the channel in order to return to Dorchester Bay by rounding the easterly end of Castle Island.

At approximately 10:30 p.m. the two vessels collided. Shortly before the collision, Gunning observed LoVuolo's vessel approaching from about thirty degrees off his starboard bow. He cut the engines and put the drive gears in neutral, but his vessel continued on forward way. He did not reverse the engines or take any other evasive action. Meanwhile, LoVuolo, upon sighting Gunning's approaching vessel, turned sharply to starboard.[1] The vessels then collided with the contact occurring between the bow of Gunning's vessel and the port quarter of LoVuolo's boat. Upon impact LoVuolo was thrown against the windshield and suffered a broken nose and deviated septum. Musto was thrown against the dashboard and suffered a bruised neck and back strain. The force of the collision caused a large gash in the port quarter and structural damage to the entire aft section of LoVuolo's vessel. The speed boat took on a considerable amount of salt water, which resulted in corrosion of the engine block. There was no serious damage to Gunning's vessel.

The district court attributed the impact both to the forward momentum of the Gunning vessel and the reciprocal motion of the stern of LoVuolo's vessel resulting from its sharp turn to starboard. Finding contributory negligence by both parties, the district court apportioned liability equally. Referring to the Inland Navigational Rules Act ("INRA"), 33 U.S.C. §§ 2001–2017 (1986),[2] it held: "Rule 8 states the over-

---

1. LoVuolo testified at trial that there was a large cruise ship in the immediate vicinity of his boat before the accident. According to LoVuolo's brief, this cruise ship, the Provincetown II, was immediately off his starboard bow; and his attention was fixed on it just prior to the collision. The district court does not mention the presence of the Provincetown II in its opinion. We, therefore, also disregard it.

2. Rule 8 of the INRA states:
    **(a) General characteristics of action taken to avoid collision**
     Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.
    **(b) Readily apparent alterations in course or speed**

Any alteration of course or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided.
**(c) Alteration of course to avoid close-quarters situation**
 If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.
**(d) Action to result in passing at safe distance**
 Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action

riding obligation of persons operating motor boats, notwithstanding the more specific provisions of Rules 15, 16 and 17."

Plaintiffs LoVuolo and Musto appeal the district court's application of law, its apportionment of liability, its damage awards for personal injuries and its findings regarding Defendant John Gunning's failure to assist plaintiffs at the time of collision as required by 46 U.S.C. § 2303 (1986).[3] Because we find that the district court erred in its application of the INRA and that this legal error infected the issues of liability and damages, we vacate its decision and remand the case for proper application of the law and such reallocation of liability and reapportionment of damages as is necessary.

## II

■ Fed.R.Civ.P. 52(a) applies to admiralty cases in which the district court sits without a jury. The court "shall find the facts specially and state separately its conclusions of law thereon. . . ." Findings of fact based on oral or documentary evidence "shall not be set aside unless clearly erro-

shall be carefully checked until the other vessel is finally past and clear.

**(e) Slackening of vessel speed; stopping or reversing means of propulsion**

If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

Rule 15 states:

**(a) Vessel which must keep out of the other vessel's way**

When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.

**(b) Vessels crossing river**

Notwithstanding paragraph (a), on the Great Lakes, Western Rivers, or water specified by the Secretary, a vessel crossing a river shall keep out of the way of a power-driven vessel ascending or descending the river.

Rule 16 states:

Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear.

Rule 17 states:

**(a) Stand-on vessel to keep course and speed; action allowed when give-way vessel fails to take appropriate action**

(i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

(ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

**(b) Action by stand-on vessel allowed when action by give-way vessel alone cannot avoid collision**

When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

**(c) Crossing situations**

A power-driven vessel which takes action in a crossing situation in accordance with subparagraph (a)(ii) of this Rule to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side.

**(d) Give-way vessel not relieved of obligation to keep out of the way**

This Rule does not relieve the give-way vessel of her obligation to keep out of the way.

**3.** 46 U.S.C. § 2303 provides:

**(a)** The master or individual in charge of a vessel involved in a marine casualty shall—

**(1)** render necessary assistance to each individual affected to save that affected individual from danger caused by the marine casualty, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or to individuals on board; and

**(2)** give the master's or individual's name and address and identification of the vessel to the master or individual in charge of any other vessel involved in the casualty, to any individual injured, and to the owner of any property damaged.

**(b)** An individual violating this section or a regulation prescribed under this section shall be fined not more then $1,000 or imprisoned for not more than 2 years. The vessel also is liable in rem to the United States Government for the fine.

**(c)** An individual complying with subsection (a) of this section or gratuitously and in good faith rendering assistance at the scene of a marine casualty without objection by an individual assisted, is not liable for damages as a result of rendering assistance or for an act or omission in providing or arranging salvage, towage, medical treatment, or other assistance when the individual acts as an ordinary, reasonable, and prudent individual would have acted under the circumstances.

neous." Rule 52(a). *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (defining the "clear error" standard as based upon "the reviewing court['s]" having weighed "the entire evidence," then reaching a "definite and firm conviction that a mistake has been committed," even though "there is evidence to support" the finding of the lower court).

In stressing the rigors of the clear error standard, we have emphasized the Rule 52(a) requirement that the lower court's findings be recited "to facilitate appellate review by making clear how it reached its result." *Burgess v. M/V Tamano,* 564 F.2d 964, 977 (1st Cir.1977), *cert. denied,* 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978). While not restraining the appellate power to correct errors of law, Fed.R. Civ.P. 52(a) "does not furnish particular guidance with respect to distinguishing law from fact." *Pullman–Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982). Still, the reviewing court must be able to deconstruct the lower court's decision and to evaluate its delineated issues of law and fact by different standards. The less exacting standard of plenary review is reserved for issues of law. *Thrifty Rent-a-Car System v. Thrift Cars, Inc.,* 831 F.2d 1177, 1181 (1st Cir.1987).

■ Ordinarily, mixed questions of law and fact are reviewed under the clearly erroneous standard. *See, e.g., United States v. Cochrane,* 896 F.2d 635, 639 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990); *Lynch v. Dukakis,* 719 F.2d 504, 513 (1st Cir.1983). We have, however, the duty to "look carefully" at district court decisions to "detect infection from legal error." *Sweeney v. Board of Trustees,* 604 F.2d 106, 109 n. 2 (1st Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). The Supreme Court teaches that "if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982) (citing *United States v. Singer Mfg. Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963)).[4] *See also United States v. Cochrane,* 896 F.2d at 639; *Hallquist v. Local 276, Plumbers and Pipefitters Union,* 843 F.2d 18, 22 (1st Cir.1988); *Kumar v. Board of Trustees,* 774 F.2d 1, 9 (1st Cir.1985), *cert. denied,* 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986).

In determining whether there was legal error, we look to the federal statutes incorporating navigational rules for lookout, crossing and collision, and to the district court's application of them.

### III

The relevant statutory standards in this case are six sections of the INRA: Rules 2, 5, 8, 15, 16 and 17, codified at 33 U.S.C. §§ 2001–2017 (1986). Admiralty law has historically adhered to "the letter of the law" respecting the statutory rules of navigation—deferring to legislative prerogatives and aiming to reduce ambiguity, as well as accidents, on American waterways. *See, e.g.,* T. Schoenbaum, *Admiralty and Maritime Law* § 4–1 (1987) ("In areas preempted by legislation, federal courts may not establish principles in derogation of the congressional mandate.").

In a landmark admiralty case, *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), the Supreme Court emphasized the dual importance of following navigational rules exactly while carefully construing legislative intent. The Court stated: "To go into the inquiry whether the legislature was not in error ... is out of place. It would be substituting our judgment for the judgment of the lawmaking power." *Id.* 86 U.S. at 137.

■ The Eleventh Circuit has restated the principle admirably:

'clearly erroneous' rule is to show that the trial court mistook the applicable law." (Citations omitted)).

---

**4.** ‘Accord *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 153 (1st Cir.1990) ("It is settled that one way around the rigors of the

Our reluctance to indulge in judicial innovation as part of statutory interpretation is heightened by the nature of the INRA, itself. The INRA is an elaborate and sophisticated network of interlocking, technical, statutory regulations governing waterborne traffic generally. Moreover, it is based, in large part, on a similar body of international regulations. Evidently, much time, energy and expert thought was invested in the INRA's development by Congress. Especially in light of the history, courts ought to be extremely slow to tamper with this sensitive, regulatory system.... Acting as we must on a case-by-case basis, we are ill prepared to know what the consequences of such innovation might be for the regulatory system and for waterborne traffic in general.

*Garrett v. Higgenbotham*, 800 F.2d 1537, 1539 (11th Cir.1986). In this case, the district court held that Rule 8, 33 U.S.C. § 2008 (1986), requiring all vessels to take effective action to avoid a collision, "states the overriding obligation of persons operating motor boats." Although alluding to Rule 5, 33 U.S.C. § 2005 (1986), requiring proper lookout by sight and hearing, as well as the crossing rules, Rules 15 through 17, 33 U.S.C. §§ 2015–2017 (1986), the district court allowed Rule 8 effectively to trump the other navigational rules.

Rule 2, 33 U.S.C. § 2002 (1986), however, states explicitly that these rules are intended to supplement, not to cancel out, each other:

**(a) Exoneration**

Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

**(b) Departure from rules when necessary to avoid immediate danger**

In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

Rule 2 establishes the necessary adherence to *all the navigational rules*, not just one. The district court's singular application of Rule 8 without weighing the full implications of the crossing rules, Rules 15 through 17, is a misapplication of the statutory standards of the INRA. It constitutes legal error.

■ While Rule 2(b) refers to "special circumstances" which "may make a departure from these Rules necessary to avoid immediate danger," there are no such circumstances noted in the district court's opinion. Moreover, such extenuating circumstances must be strictly evaluated to justify precluding application of any given navigational rule. *See United Overseas Export Lines v. Medluck Compania Maviera*, 785 F.2d 1320, 1324 (5th Cir.1986) (rejecting "special circumstance" of starboard-to-starboard passing course under Rule 2(b)).

■ The district court properly determined that both the plaintiff's and the defendant's vessels were contributorily negligent in failing to maintain a proper lookout under Rule 5. *See, e.g., Inland Tugs Co. v. Ohio River Co.*, 709 F.2d 1065, 1073 (6th Cir.1983) ("[I]t is well-settled that contributory negligence may result from a failure to maintain a sufficient and proper lookout."); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir.), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1977). *Cf. New York, New Haven and Hartford R.R. Co. v. Baltimore & Ohio R.R. Co.*, 236 F.2d 228, 232 (2d Cir.1956) ("[F]ailure so to post a lookout must be presumed to have contributed to the collision unless the offending vessel shows that it could not have contributed.").

By allowing Rule 8 to override all other rules, the district court failed to weigh the full implications of the three crossing rules. Rule 15, the starboard rule, states the obligations of the give-way vessel, here the defendants' boat:

(a) When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.

Rule 16 further elucidates the duty on defendant Gunning and the give-way vessel:

Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear.

Rule 17 delineates the duties of plaintiff LoVuolo on his privileged vessel. This vessel is required to "keep her course and speed" in event of crossing.

(a)(ii) The latter [privileged] vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

Rule 17(b) also empowers the privileged vessel which "finds herself so close that collision cannot be avoided by the action of the give-way vessel alone," to "take such action as will best aid to avoid collision." Rule 17(c) counsels that the privileged vessel must "not alter course to port for a vessel on her own port side." Finally, Rule 17(d) underlines the primary obligation of defendant Gunning: "This Rule does not relieve the give-way vessel of her obligation to keep out of the way."

The district court assessed equal liability of the parties under both Rules 5 and 8—failure to maintain proper lookout and failure to take action to avoid collision. Rule 8 neutrally obligates both vessels to avoid collision. That action shall "be positive, made in ample time and with due regard to the observance of good seamanship." Rule 8(a). Further, it instructs that "[a]ny alteration of course or speed to avoid collision" should be "large enough to be readily apparent to another vessel." Rule 8(b). And finally, a vessel on collision course shall "slacken her speed or take all way off by stopping or reversing her means of propulsion." Rule 8(e).

■ Gunning, having sighted LoVuolo's vessel 30 degrees off his starboard bow, was clearly the give-way vessel. Rule 15. According to his own testimony, he saw LoVuolo's vessel "in the vicinity of approximately 200 feet." The crossing rules, largely ignored by the district court, dictate "early and substantial action to keep well clear." Rule 16. Gunning did not take such decisive action. In the words of the district court, "He did not reverse the engines or take any evasive action. His vessel continued to have its forward way and soon thereafter collided with the motor boat, which was owned and operated by the plaintiff LoVuolo."

Plaintiff LoVuolo's responsibilities are similarly spelled out by the crossing rules. As the privileged vessel, he was to keep his course and speed unless, as here, "the vessel required to keep out of the way [Gunning's] is not taking appropriate action." Rule 17(a)(i), (ii). Culpable in failing to maintain adequate lookout, LoVuolo belatedly perceived Gunning's imminent failure to avert collision. Rule 17(b) requires that he then take "such action as will best aid to avoid collision." *See Pinto v. M/S Fernwood*, 507 F.2d 1327, 1330–31 (1st Cir.1974) (maintaining that privileged vessel not required to keep to course in extenuating circumstances). Rule 17(c) then mandates a turn only to his starboard side, which LoVuolo attempted. The district court viewed this maneuver as too little, too late, and consequently held that neither party took appropriate action to avoid the collision under Rule 8. We do not challenge the district court's finding of the facts, only its failure to consider fully and evenhandedly all applicable navigational rules. In the words of a recent Eighth Circuit admiralty case, "A causal relationship between the plaintiff's fault and the harm suffered is a prerequisite to apportionment of damages." *Ohio River Co. v. Peavey Co.*, 731 F.2d 547, 549 (8th Cir.1984).

Here, the district court's primary application of Rule 8 and its failure to factor equally the other rules in weighing both

parties' conduct has impacted upon the court's ultimate apportionment of damages. This was basically an error of law; the district court's legal error fatally infected its factual findings. Liability and damages for both parties must be reapportioned.[5]

■ In making this reapportionment the district court should keep in mind that a finding of equal fault is now the exception rather than the rule. In 1975, sixty-five years after the rest of the maritime world[6], the Supreme Court held in *United States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), that liability for damages in maritime collision

> is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Id.* at 411, 95 S.Ct. at 1716. This proportionate fault rule encompasses damages for personal injury and death as well as for property. Vickery, *Special Problems of Personal Injury and Death Arising out of Collision Disaster Cases*, 51 Tul.L.Rev. 896, 935 (1977).

## IV

Plaintiffs LoVuolo and Musto have both appealed the trial court's personal injury awards as inadequate and clearly erroneous. Although the personal injury awards may be changed upon reallocation of fault on remand, we do not find the district court's factual conclusions regarding physical injury, pain and suffering, and emotional distress to be clearly erroneous. Hence, we overrule this segment of the plaintiff's appeal and affirm the district court's quantification of damages.

## V

■ The plaintiffs claim that defendant John Gunning failed to offer assistance to passengers on the damaged LoVuolo vessel after collision. The very existence of 46 U.S.C. § 2303 underlines the importance of proffering aid in maritime accidents: "(a) The master or individual in charge of a vessel involved in a marine casualty shall— (1) render necessary assistance to each individual affected to save that affected individual from danger caused by the marine casualty." No assistance was offered by Gunning. And it is uncontested that Gunning never identified himself after the collision as required by 46 U.S.C. § 2303(a)(2). We agree with the district court that the defendant's post-collision conduct should have met a higher standard. Still, the district court found that "because the plaintiffs were shortly rescued by the Coast Guard … [they] suffered no injury by reason of any delinquency on the defendant's part." We conclude that this finding cannot be overturned under the clear error standard. The appeal by plaintiffs claiming a violation of 46 U.S.C. § 2303 is without merit.

---

5.  *Curtis Bay Towing Co. v. Sadowski*, on which the defense leans, is helpful in explicating the obligations of a privileged vessel at the time of collision. 247 F.2d 422, 425 (4th Cir.1957). It is, however, entirely outdated in its reliance upon equal allocation of damages as given because it predates by nearly twenty years the now-universal rule of comparative negligence defined by the Supreme Court in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

6.  Signers of the Brussels Collision Convention, to which the United States has never become a party, agreed on the principle of comparative negligence resulting in unequal allocation of maritime damages as early as 1910. Paulsen, *Provable Damages in Collision Cases*, 51 Tul.L. Rev. 1047, 1057 (1977). Even before *Reliable*

*Transfer,* trial courts and courts of appeal were individually "free to apportion damages unequally where the relative degrees of fault [could] be determined." Staring, *Contribution and Division of Damages in Admiralty and Maritime Cases*, 45 Calif.L.Rev. 304, 345 (1957). When American courts found contributory negligence in marine collision cases before 1975, however, they customarily divided damages equally. *See, e.g., Gulf Oil Corp. v. The Socony No. 16*, 162 F.2d 869 (2d Cir.1947) (holding tug without adequate lookout liable for half damages in collision). This admiralty law of divided damages was first implemented more than a century ago in *The Schooner Catharine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1854) (cited in *Reliable Transfer*, 421 U.S. at 397, 95 S.Ct. at 1708).

## VI

We vacate the decision of the lower court and remand for proper application of the INRA and reallocation of fault and damages.

Affirmed in part, reversed in part. Costs awarded to appellants.