COMPUTER SYSTEMS OF AMERICA,
INC., Plaintiff, Appellant,

v.

UNUM LIFE INSURANCE COMPANY,
et al., Defendants, Appellees.

No. 92–1087.

United States Court of Appeals,
First Circuit.

Heard June 3, 1992.

Decided Sept. 21, 1992.

Douglas G. Moxham with whom Geoffrey R. Bok, and Lane & Altman, Boston, Mass., were on brief, for plaintiff, appellant.

Evan R. Chesler with whom Cravath, Swaine & Moore, New York City, Arnold P. Messing, Kevin J. Lesinski, and Choate, Hall & Stewart, Boston, Mass., were on

brief, for defendant, appellee International Business Machines Corp.

Barbara H. Furey, Asst. Gen. Counsel, UNUM Life Ins. Co. of America, Portland, Me., with whom Marjorie R. Summers, and Craig and Macauley, P.C., Boston, Mass., were on brief, for defendant, appellee UNUM Life Ins. Co.

Before BREYER, Chief Judge, O'SCANNLAIN,* Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Appellant Computer Systems of America, Inc. ("CSA") initiated the present action in Suffolk Superior Court against UNUM Life Insurance Company ("UNUM"), claiming that UNUM had converted computer equipment which CSA had acquired by accession either under the terms of its computer lease with UNUM or under the common law doctrine of accession.[1] The complaint alleged that accession occurred as a consequence of a reconfiguration of the IBM computer UNUM leased from CSA. Following a three-day bench trial, the district court determined that the changes made to the computer were not permanent and that the reconfigured components were "readily removable." Based on its interpretation of the lease and the intent of the parties, the court found no accession. CSA appealed.

## I

## BACKGROUND

The IBM 3090 computer system located at UNUM's facility in Portland, Maine, was purchased from IBM in 1985 by CSA's predecessor in interest and leased to UNUM. According to the terms of the lease, UNUM was permitted to reconfigure the computer, subject to certain conditions. First, "[a]ll repairs, replacements and substitutions of parts.... [would] be considered accessions to, and immediately upon the installation thereof, [would] be deemed for all purposes part of, the Equipment[,] and title thereto [would] be immediately and automatically vested in [CSA]." Second, UNUM was allowed to "add additional equipment," the title to which would not pass to CSA by accession provided it was "readily removable" in a manner which would not reduce the "value or usefulness of the Equipment below the value or usefulness which it would have had without any such additional equipment." It remained the responsibility of the lessee, however, to remove any additional equipment at the expiration of the lease and to "restore the Equipment to the condition it was in immediately prior to the addition of such additional equipment (normal wear and tear excepted)." At the end of the lease term, the lessee was required to return the equipment to the lessor "in the same operating order, repair, condition and appearance as when received...."

At the time it was leased to UNUM, the IBM 3090 computer was a model 200 Base, *i.e.*, it contained two processor engines and utilized what is known as a "Base" technology system, readily reconfigurable to accommodate more processor engines (*e.g.*, upgrading the computer to a model 400 or 600) and more advanced technology (*e.g.*, upgrading to model "E," "S," or "J").[2] Computer system technology reconfigurations are accomplished with thermal conductive modules ("TCM's") which are simply "plugged" into the computer mainframe. The computer leased to UNUM was reconfigured initially to a 400 Base, then to a model 600E, and finally, in March 1990, to a model 600J. The technology installed to effect the "E" and "J" upgrades was leased to UNUM by Bell Atlantic Systems Leasing ("BASLI"). Prior to the final upgrade to "J" technology, CSA

---

* Of the Ninth Circuit, sitting by designation.

1. UNUM removed the case to the United States District Court for the District of Massachusetts. CSA filed an amended complaint, adding International Business Machines Corporation ("IBM") as a defendant and alleging that IBM had converted CSA's property by reconfiguring the computer for UNUM.

2. Computer models are defined both by the number of processor engines and the type of technology. Computer models can also be varied with respect to memory type and channel capacity. An IBM 3090 system can be configured in more than 2 million ways.

notified UNUM that it would claim title to any "TCM's" containing the "J" technology. At the end of the lease term, UNUM returned the IBM 3090 Base 200 computer to CSA.[3] CSA commenced the present action claiming entitlement to an IBM 3090 200 computer system with "J" rather than Base technology.[4]

## II

## DISCUSSION

### A. *The Lease*

CSA contends that the lease agreement with UNUM is unambiguous and its interpretation presents a legal issue subject to *de novo* review. UNUM and IBM, on the other hand, insist that the relevant lease terms are ambiguous and present a mixed question of law and fact appropriate for "clear error" review. As we conclude that the pertinent terms are ambiguous, their interpretation poses a mixed question of law and fact under New York law,[5] *Meyer v. Certified Moving & Storage Co.*, 162 A.D.2d 109, 556 N.Y.S.2d 63, 65 (1990); *Kenyon v. Knights Templar & M. Mut. Aid Ass'n*, 122 N.Y. 247, 25 N.E. 299 (1890), which we review for clear error. *American Title Ins. Co. v. East West Financial Corp.*, 959 F.2d 345, 346 (1st Cir.1992) (mixed questions of law and fact reviewed for clear error); *LoVuolo v. Gunning*, 925 F.2d 22, 25 (1st Cir.1991) (same). A dispute as to whether the terms of a contract are ambiguous presents a question of law for the court. *See, e.g., Amusement Business Underwriters v. American Int'l Group, Inc.*, 66 N.Y.2d 878, 498 N.Y.S.2d 760, 763, 489 N.E.2d 729, 732 (1985); *cf. Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989) (ambiguity determination is for the court). Contract terms are ambiguous where "[r]easonable minds could differ" as to their meaning. *Van Wagner Adv. v. S & M Enters.*, 67 N.Y.2d 186, 501 N.Y.S.2d 628, 631, 492 N.E.2d 756, 758 (1986).

At issue under the terms of the UNUM lease is whether the computer modifications were "replacements" or "substitutions," which became accessions to the CSA computer, or "additional equipment," which did not. These terms are not defined in the lease, nor do the terms themselves, either in context or in isolation, make manifest the intention of the parties with respect to the accession of TCM's utilized to reconfigure the computer technology in the present case. As of the time the lease was executed, IBM had not yet informed the public whether upgrades would be accomplished by the removal of parts and the insertion of others (as happened here) or simply by the addition of more parts. Thus, it does not appear that the parties could have formed a mutual intention, at the time of the lease, as to whether upgrades were to be treated as "substitutions" or "additions." We therefore conclude that these terms were ambiguous. *See Van Wagner Adv.*, 501 N.Y.S.2d at 631, 492 N.E.2d at 758; *see also Fashion House, Inc.*, 892 F.2d at 1083 (contract language usually considered ambiguous "where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken."). Where "a contract is thought ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists." *Id.* (citing *Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1268 (7th Cir.1984)).

CSA claims that the removal of the Base technology and the successive installations of the "E" and "J" technologies resulted in "substitutions" and "replacements" under

---

**3.** Immediately prior to the expiration of the lease term, UNUM contracted with IBM to downgrade the system to a 200 Base, *i.e.*, a system equivalent to that originally leased by UNUM. The downgrade required no more than 100 hours.

**4.** CSA claims neither the four processors installed to upgrade the leased computer from model 200 to model 600, nor the companion technology.

**5.** The parties do not dispute the applicability of New York law, as the lease provides that it "shall be governed and construed for all purposes under and in accordance with the laws of the State of New York."

the lease, which meant that CSA acquired title to the "J" technology by accession under the terms of the lease. CSA rests its entire argument on the ground that the "plain, ordinary meaning" of the lease compels a finding of accession. *See Olenick v. Government Employees Ins. Co.*, 42 A.D.2d 760, 346 N.Y.S.2d 320, 321 (1973) (interpreting insurance contract according to its "plain, ordinary meaning"). According to CSA, a "replacement" or "substitution" plainly means a thing "put in the place of another." On the other hand, the term "additional equipment," according to CSA, entails an installation "without the corresponding removal of functionally equivalent parts." As it is undisputed that other components were removed from the computer when the TCM's containing the "J" technology were installed, according to CSA the "J" TCM's clearly were "replacements" or "substitutions" under the terms of the lease and became accessions to the CSA-owned computer. *But cf. id.*, 346 N.Y.S.2d at 321 (" 'replace,' given its plain, ordinary meaning, means to supplant with a substitute or *equivalent* ") (emphasis added).

CSA further contends that the TCM's could not be considered "additional equipment" because the lease prohibits "add[ing] to the Equipment additional equipment not readily removable or, even if readily removable, which cannot be removed without reducing the value or usefulness of the Equipment below the value or usefulness which it would have had without any such additional equipment." According to CSA, given the time required to remove the TCM's and the fact that without any TCM's the computer will not function and is reduced in value and usefulness, the TCM's could not be "additional equipment" under the lease.[6]

Under New York law, "[i]n the interpretation of leases, the same rules of construction apply as are applicable to contracts generally." *Tantleff v. Truscelli*, 110

A.D.2d 240, 493 N.Y.S.2d 979, 982 (1985) *aff'd*, 69 N.Y.2d 769, 513 N.Y.S.2d 113, 505 N.E.2d 623 (1987) (citing *George Backer Management Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 138, 385 N.E.2d 1062, 1065 (1978)). The intent of the parties governs. *See, e.g., Richardson v. Steuben County*, 226 N.Y. 13, 19, 122 N.E. 449, 450 (1919) (in interpreting contracts courts must seek "the true intent of the parties who executed them"); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 896 (2d Cir.1976) ("essential tool in properly interpreting a contract is to first ascertain the intent of the parties") (applying New York law). The "intention of the parties must be gleaned from all corners of the document, rather than from sentences or clauses viewed in isolation." *Tougher Heating & Plumbing Co. v. State*, 73 A.D.2d 732, 423 N.Y.S.2d 289, 290–91 (1979). Moreover, when the contract language is ambiguous, extrinsic evidence, including course of performance by the parties and standard industry practice, is relevant in determining intent. *See, e.g., State v. Home Indem. Co.*, 66 N.Y.2d 669, 495 N.Y.S.2d 969, 971, 486 N.E.2d 827, 829 (1985) (extrinsic evidence may aid in interpretation of ambiguous contract); *Pease & Elliman, Inc. v. Weissman*, 4 A.D.2d 936, 167 N.Y.S.2d 601, 602 (1957) (court often can gain interpretive guidance from conduct of parties under contract); *Edison v. Viva Int'l, Ltd.*, 70 A.D.2d 379, 421 N.Y.S.2d 203, 205 (1979) ("contract must be construed according to the custom and use prevailing in a particular trade"). "[W]hen a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." *Amusement Business Underwriters*, 66 N.Y.2d at 880, 498 N.Y.S.2d at 763, 489 N.E.2d at 732.

The CSA argument assumes that the terms of the lease are unambiguous and

---

**6.** According to the terms of the lease, "[o]ther than the repairs, replacements and substitution of parts [all of which are the property of the Lessor] ... and the additional equipment permitted under § 12, Lessee shall not add any equipment to the Equipment or alter or modify the Equipment in any manner." Thus, any reconfiguration must be either a "repair[ ], replacement[ or] substitution" or "additional equipment."

must be interpreted without resort to extrinsic evidence. The district court implicitly found, however, and we agree, that "substitution," "replacement" and "addition" are terms about whose meaning in the lease "[r]easonable minds could differ." *Van Wagner Adv.*, 501 N.Y.S.2d at 631, 492 N.E.2d at 758. The district court resolved the ambiguity through resort to the state of the knowledge of the parties as to upgrades at the time of the lease, industry practice, the commercial purpose to be served by the lease, and the conduct of the parties under the lease.

■ Based on its consideration of the extrinsic evidence, the court determined that the parties did not intend the interpretation proposed by CSA. According to the court, the parties did not intend the term "substitution" to encompass every circumstance in which a part is removed and another is put in its place, but only those circumstances in which an "equivalent" part is put back in which "does the same thing" as the removed part. The district court "read the term 'substitution' as referring to equivalence." *See Olenick*, 346 N.Y.S.2d at 321. A "replacement," on the other hand, would contemplate the installation of a new part of the exact same type as the removed part.[7] In other words, "substitutions" and "replacements" were found to refer to installations which maintain the equipment in its state or condition at the onset of the lease; "additional equipment" contemplates modifications. Since the "J" technology UNUM installed was in no sense merely "equivalent" to the removed TCM's, the district court found that it constituted a modification which CSA did not acquire by accession under the terms of the lease. We find no error.

First, a UNUM employee involved in the negotiation of the original lease presented testimony to the effect that the parties

intended section 12 ("additions") to mean upgrades, and section 8 ("substitutions" and "replacements") to mean parts installed in place of failed parts and not as upgrades. Second, the district court's interpretation is supported by evidence that mixed ownership of base machines and upgrades is common industry practice. No witness identified an instance in the computer industry where the owner of a base system was found to have acquired title by accession to any computer upgrade involving advanced technology. Third, CSA's conduct during the lease term cast doubt on its current contention that it, rather than BASLI, owns the "J" technology.[8] Fourth, unlike CSA's interpretation, the district court interpretation makes sound commercial sense. Under the CSA interpretation, CSA would acquire title to technology worth more than $2,000,000, without payment. *See River View Ass'n. v. Sheraton Corp. of America*, 33 A.D.2d 187, 306 N.Y.S.2d 153, 156 (1969), *aff'd.*, 27 N.Y.2d 718, 314 N.Y.S.2d 181, 262 N.E.2d 416 (1970) ("[P]arties to an agreement are presumed to act sensibly in regard to it and an interpretation that produces an absurdly harsh result is to be avoided"). Sixth, the sensible functional distinction the district court drew between replacements and modifications best comports with the terms of the lease as a whole. For example, the same section that accords accession rights to the lessor in respect to "repairs, replacements and substitutions" prescribes the lessee's duty to "maintain the Equipment in good operating order, repair, condition, and appearance...." Finally, the district court supportably found that the "J" TCM's were "readily removable" and thus the sort of "additional equipment" UNUM was allowed to add under the terms of the lease.

---

7. As the court said:
   Replacement would mean, for example, putting in an item that has the same part number. So you take out item, that is part number 123, and you put in another one that is part number 123. Substitution means part number 123 is unavailable, but you [have] 345 that does the same thing, so you put in 345.

8. Prior to the expiration of the lease, CSA attempted to sell the 200 Base computer at a time when it was about to be upgraded to 200E. Under CSA's accession theory, however, it could have acquired title to the "E" technology at no cost merely by awaiting its installation.

**B. *Doctrine of Accession***

 Alternatively, CSA claims ownership of the enhanced technology under the common law doctrine of accession. The parties agree that Maine common law controls. *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 853 n. 3 (1st Cir.1987) (appellate court will accept parties' "expressed preference" and "implicit concession" as to controlling law, where "[t]hey have briefed the question in those terms and the district court ruled on that basis."); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 31 (1st Cir.1984). Under Maine law, three factors govern whether an accession occurs.

> [A] chattel is not merged into the realty unless (1) it is physically annexed, at least by juxtaposition, to the realty or some appurtenance thereof, (2) it is adapted to and usable with that part of the realty to which it is annexed, *and* (3) it was so annexed with the intention, on the part of the person making the annexation, to make it a permanent accession to the realty.

*Franklin Property Trust v. Foresite, Inc.*, 489 A.2d 12, 14 (Me.1985) (citing *Hayford v. Wentworth*, 97 Me. 347, 350, 54 A. 940, 941 (1903)) (emphasis added). *See In re Lyford*, 22 B.R. 222, 224 (Bankr.D.Me.1982) (applying *Hayford* factors to determine whether cab and chassis were accessions to truck). All three elements in the *Hayford* accession test must be met, but "special prominence must be attached to the intention of the party making the annexation." *Id.* The party asserting the accession claim bears the burden of proof. *Hayford v. Wentworth*, 97 Me. 347, 350, 54 A. 940; *Franklin Property Trust*, 489 A.2d at 14.

The district court supportably found, on the basis of testimony it explicitly credited, that the time taken to remove the "J" TCM's and restore the original base technology was not out of proportion to the time required for an ordinary upgrade and therefore that the "J" TCM's were "readily removable." Thus, it was not clear error to conclude that no physical annexation of the technology occurred. *See, e.g., Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 840 (1st Cir.1990) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)) (no "clear error" where district court adopts plausible view of evidence). Furthermore, no evidence was produced at trial that any party involved in the TCM installation ever anticipated, let alone that UNUM intended, that the TCM's would become accessions to the CSA-owned computer. The uncontradicted testimony was to the contrary. Accordingly, the district court determination that CSA did not acquire the "J" TCM's by accession under Maine common law must be affirmed.

*The district court judgment is affirmed.*