USCA1 Opinion

 

 September 21, 1992 UNITED STATES COURT OF APPEALS September 21, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT No. 92-1087 No. 92-1087 COMPUTER SYSTEMS OF AMERICA, INC., COMPUTER SYSTEMS OF AMERICA, INC., Plaintiff, Appellant, Plaintiff, Appellant, v. v. UNUM LIFE INSURANCE COMPANY, ET AL., UNUM LIFE INSURANCE COMPANY, ET AL., Defendants, Appellees. Defendants, Appellees. ____________________ ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ ____________________ Before Before Breyer, Chief Judge, Breyer, Chief Judge, ___________ O'Scannlain,* Circuit Judge, O'Scannlain,* Circuit Judge, _____________ and Cyr, Circuit Judge. and Cyr, Circuit Judge. _____________ ____________________ ____________________ Douglas G. Moxham with whom Geoffrey R. Bok and Lane & Altman Douglas G. Moxham with whom Geoffrey R. Bok and Lane & Altman __________________ ________________ ______________ were on brief for appellant. were on brief for appellant. Evan R. Chesler with whom Cravath, Swaine & Moore, Arnold P. Evan R. Chesler with whom Cravath, Swaine & Moore, Arnold P. ________________ _________________________ _________ Messing, Kevin J. Lesinski and Choate, Hall & Stewart were on brief Messing, Kevin J. Lesinski and Choate, Hall & Stewart were on brief _______ __________________ _______________________ for appellees. for appellees. ____________________ ____________________ ____________________ ____________________ *Of the Ninth Circuit, sitting by designation. *Of the Ninth Circuit, sitting by designation. CYR, Circuit Judge. Appellant Computer Systems of CYR, Circuit Judge. _____________ America, Inc. ("CSA") initiated the present action in Suffolk Superior Court against UNUM Life Insurance Company ("UNUM"), claiming that UNUM had converted computer equipment which CSA had acquired by accession either under the terms of its computer lease with UNUM or under the common law doctrine of accession.1 The complaint alleged that accession occurred as a consequence of a reconfiguration of the IBM computer UNUM leased from CSA. Following a three-day bench trial, the district court determined that the changes made to the computer were not permanent and that the reconfigured components were "readily removable." Based on its interpretation of the lease and the intent of the parties, the court found no accession. CSA appealed. I I BACKGROUND BACKGROUND __________ The IBM 3090 computer system located at UNUM's facility in Portland, Maine, was purchased from IBM in 1985 by CSA's predecessor in interest and leased to UNUM. According to the terms of the lease, UNUM was permitted to reconfigure the computer, subject to certain conditions. First, "[a]ll repairs, replacements and substitutions of parts . . . . [would] be ____________________ 1UNUM removed the case to the United States District Court for the District of Massachusetts. CSA filed an amended complaint, adding International Business Machines Corporation ("IBM") as a defendant and alleging that IBM had converted CSA's property by reconfiguring the computer for UNUM. 2 considered accessions to, and immediately upon the installation thereof, [would] be deemed for all purposes part of, the Equip- ment[,] and title thereto [would] be immediately and automatically vested in [CSA]." Second, UNUM was allowed to "add additional equipment," the title to which would not pass to CSA by accession provided it was "readily removable" in a manner which would not reduce the "value or usefulness of the Equipment below the value or usefulness which it would have had without any such additional equipment." It remained the responsibility of the lessee, however, to remove any additional equipment at the expiration of the lease and to "restore the Equipment to the condition it was in immediately prior to the addition of such additional equipment (normal wear and tear excepted)." At the end of the lease term, the lessee was required to return the equipment to the lessor "in the same operating order, repair, condition and appearance as when received . . . ." At the time it was leased to UNUM, the IBM 3090 computer was a model 200 Base, i.e., it contained two processor ____ engines and utilized what is known as a "Base" technology system, readily reconfigurable to accommodate more processor engines (e.g., upgrading the computer to a model 400 or 600) and more ____ advanced technology (e.g., upgrading to model "E," "S," or ____ "J").2 Computer system technology reconfigurations are ____________________ 2Computer models are defined both by the number of processor engines and the type of technology. Computer models can also be varied with respect to memory type and channel capacity. An IBM 3090 system can be configured in more than 2 million ways. 3 accomplished with thermal conductive modules ("TCM's") which are simply "plugged" into the computer mainframe. The computer leased to UNUM was reconfigured initially to a 400 Base, then to a model 600E, and finally, in March 1990, to a model 600J. The technology installed to effect the "E" and "J" upgrades was leased to UNUM by Bell Atlantic Systems Leasing ("BASLI"). Prior to the final upgrade to "J" technology, CSA notified UNUM that it would claim title to any "TCM's" containing the "J" technology. At the end of the lease term, UNUM returned the IBM 3090 Base 200 computer to CSA.3 CSA commenced the present action claiming entitlement to an IBM 3090 200 computer system with "J" rather than Base technology.4 II II DISCUSSION DISCUSSION __________ A. The Lease A. The Lease _________ CSA contends that the lease agreement with UNUM is unambiguous and its interpretation presents a legal issue subject to de novo review. UNUM and IBM, on the other hand, insist that __ ____ the relevant lease terms are ambiguous and present a mixed question of law and fact appropriate for "clear error" review. ____________________ 3Immediately prior to the expiration of the lease term, UNUM contracted with IBM to downgrade the system to a 200 Base, i.e., ____ a system equivalent to that originally leased by UNUM. The downgrade required no more than 100 hours. 4CSA claims neither the four processors installed to upgrade the leased computer from model 200 to model 600, nor the companion technology. 4 As we conclude that the pertinent terms are ambiguous, their interpretation poses a mixed question of law and fact under New York law,5 Meyer v. Certified Moving & Storage Co., 556 N.Y.S.2d _____ ______________________________ 63, 65 (1990); Kenyon v. Knights Templar & M. Mut. Aid Ass'n., ______ _____________________________________ 122 N.Y. 247, 25 N.E. 299 (1890), which we review for clear error. American Title Ins. Co. v. East West Financial Corp., 959 _______________________ _________________________ F.2d 345, 346 (1st Cir. 1992) (mixed questions of law and fact reviewed for clear error); LoVuolo v. Gunning, 925 F.2d 22, 25 _______ _______ (1st Cir. 1991) (same). A dispute as to whether the terms of a contract are ambiguous presents a question of law for the court. See, e.g., Amusement Business Underwriters v. American Int'l ___ ____ ________________________________ _______________ Group, Inc., 66 N.Y.2d 878, 489 N.E.2d 729, 732 (1985); cf. ____________ ___ Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st ___________________ _____________ Cir. 1989) (ambiguity determination is for the court). Contract terms are ambiguous where "[r]easonable minds could differ" as to their meaning. Van Wagner Adv. v. S & M Enters., 501 N.Y.S.2d _______________ ______________ 628, 631, 492 N.E.2d 756, 758 (1986). At issue under the terms of the UNUM lease is whether the computer modifications were "replacements" or "substitutions," which became accessions to the CSA computer, or "additional equipment," which did not. These terms are not defined in the lease, nor do the terms themselves, either in context or in isolation, make manifest the intention of the ____________________ 5The parties do not dispute the applicability of New York law, as the lease provides that it "shall be governed and construed for all purposes under and in accordance with the laws of the State of New York." 5 parties with respect to the accession of TCM's utilized to recon- figure the computer technology in the present case. As of the time the lease was executed, IBM had not yet informed the public whether upgrades would be accomplished by the removal of parts and the insertion of others (as happened here) or simply by the addition of more parts. Thus, it does not appear that the parties could have formed a mutual intention, at the time of the lease, as to whether upgrades were to be treated as "substitutions" or "additions." We therefore conclude that these terms were ambiguous. See Van Wagner Adv., 501 N.Y.S.2d at 631, ___ _______________ 492 N.E.2d at 758; see also Fashion House, Inc., 892 F.2d at 1083 ___ ____ ___________________ (contract language usually considered ambiguous "where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken."). Where "a contract is thought ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists." Id. (citing Sunstream Jet Express, Inc. v. ___ ____________________________ International Air Service Co., 734 F.2d 1258, 1268 (7th Cir. _______________________________ 1984)). CSA claims that the removal of the Base technology and the successive installations of the "E" and "J" technologies resulted in "substitutions" and "replacements" under the lease, which meant that CSA acquired title to the "J" technology by accession under the terms of the lease. CSA rests its entire argument on the ground that the "plain, ordinary meaning" of the lease compels a finding of accession. See Olenick v. Government ___ _______ __________ 6 Employees Ins. Co., 346 N.Y.S.2d 320, 321 (1973) (interpreting ___________________ insurance contract according to its "plain, ordinary meaning"). According to CSA, a "replacement" or "substitution" plainly means a thing "put in the place of another." On the other hand, the term "additional equipment," according to CSA, entails an installation "without the corresponding removal of functionally equivalent parts." As it is undisputed that other components were removed from the computer when the TCM's containing the "J" technology were installed, according to CSA the "J" TCM's clearly were "replacements" or "substitutions" under the terms of the lease and became accessions to the CSA-owned computer. But cf. ___ ___ id., 346 N.Y.S.2d at 321 ("'replace,' given its plain, ordinary ___ meaning, means to supplant with a substitute or equivalent") __________ (emphasis added). CSA further contends that the TCM's could not be considered "additional equipment" because the lease prohibits "add[ing] to the Equipment additional equipment not readily removable or, even if readily removable, which cannot be removed without reducing the value or usefulness of the Equipment below the value or usefulness which it would have had without any such additional equipment." According to CSA, given the time required to remove the TCM's and the fact that without any TCM's the computer will not function and is reduced in value and usefulness, the TCM's could not be "additional equipment" under 7 the lease.6 Under New York law, "[i]n the interpretation of leases, the same rules of construction apply as are applicable to contracts generally." Tantleff v. Truscelli, 493 N.Y.S.2d 979, ________ _________ 982 (1985) aff'd, 69 N.Y.2d 769, 505 N.E.2d 623 (1987) (citing _____ George Backer Management Corp. v. Acme Quilting Co., 46 N.Y.2d _______________________________ _________________ 211, 385 N.E.2d 1062, 1065 (1978)). The intent of the parties governs. See, e.g., Richardson v. Steuben County, 226 N.Y. 13, ___ ____ __________ ______________ 19, 122 N.E. 449, 450 (1919) (in interpreting contracts courts must seek "the true intent of the parties who executed them"); Lipsky v. Commonwealth United Corp., 551 F.2d 887, 896 (2d Cir. ______ __________________________ 1976) ("essential tool in properly interpreting a contract is to first ascertain the intent of the parties") (applying New York law). The "intention of the parties must be gleaned from all corners of the document, rather than from sentences or clauses viewed in isolation." Tougher Heating & Plumbing Co. v. State, ______________________________ _____ 423 N.Y.S.2d 289, 290-91 (1979). Moreover, when the contract language is ambiguous, extrinsic evidence, including course of performance by the parties and standard industry practice, is relevant in determining intent. See, e.g., State v. Home Indem. ___ ____ _____ ___________ Co., 66 N.Y.2d 669, 486 N.E.2d 827, 829 (1985) (extrinsic ___ evidence may aid in interpretation of ambiguous contract); Pease _____ ____________________ 6According to the terms of the lease, "[o]ther than the repairs, replacements and substitution of parts [all of which are the property of the Lessor] . . . and the additional equipment permitted under 12, Lessee shall not add any equipment to the Equipment or alter or modify the Equipment in any manner." Thus, any reconfiguration must be either a "repair[], replacement[ or] substitution" or "additional equipment." 8 & Elliman, Inc. v. Weissman, 167 N.Y.S.2d 601, 602 (1957) (court ________________ ________ often can gain interpretive guidance from conduct of parties under contract); Edison v. Viva Int'l, Ltd., 421 N.Y.S.2d 203, ______ _________________ 205 (1979) ("contract must be construed according to the custom and use prevailing in a particular trade"). "[W]hen a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." Amusement Business Underwriters, 66 ________________________________ N.Y.2d at 880, 489 N.E.2d at 732. The CSA argument assumes that the terms of the lease are unambiguous and must be interpreted without resort to extrinsic evidence. The district court implicitly found, however, and we agree, that "substitution," "replacement" and "addition" are terms about whose meaning in the lease "[r]easonable minds could differ." Van Wagner Adv., 501 N.Y.S.2d _______________ at 631, 492 N.E.2d at 758. The district court resolved the ambiguity through resort to the state of the knowledge of the parties as to upgrades at the time of the lease, industry practice, the commercial purpose to be served by the lease, and the conduct of the parties under the lease. Based on its consideration of the extrinsic evidence, the court determined that the parties did not intend the interpretation proposed by CSA. According to the court, the parties did not intend the term "substitution" to encompass every circumstance in which a part is removed and another is put in its 9 place, but only those circumstances in which an "equivalent" part is put back in which "does the same thing" as the removed part. The district court "read the term 'substitution' as referring to equivalence." See Olenick, 346 N.Y.S.2d at 321. A ___ _______ "replacement," on the other hand, would contemplate the installation of a new part of the exact same type as the removed part.7 In other words, "substitutions" and "replacements" were found to refer to installations which maintain the equipment in its state or condition at the onset of the lease; "additional equipment" contemplates modifications. Since the "J" technology UNUM installed was in no sense merely "equivalent" to the removed TCM's, the district court found that it constituted a modification which CSA did not acquire by accession under the terms of the lease. We find no error. First, a UNUM employee involved in the negotiation of the original lease presented testimony to the effect that the parties intended section 12 ("additions") to mean upgrades, and section 8 ("substitutions" and "replacements") to mean parts installed in place of failed parts and not as upgrades. Second, the district court's interpretation is supported by evidence that mixed ownership of base machines and upgrades is common industry ____________________ 7As the court said: Replacement would mean, for example, putting in an item that has the same part number. So you take out item, that is part number 123, and you put in another one that is part number 123. Substitution means part number 123 is unavailable, but you [have] 345 that does the same thing, so you put in 345. 10 practice. No witness identified an instance in the computer industry where the owner of a base system was found to have acquired title by accession to any computer upgrade involving advanced technology. Third, CSA's conduct during the lease term cast doubt on its current contention that it, rather than BASLI, owns the "J" technology.8 Fourth, unlike CSA's interpretation, the district court interpretation makes sound commercial sense. Under the CSA interpretation, CSA would acquire title to technology worth more than $2,000,000, without payment. See ___ River View Ass'n. v. Sheraton Corp. of America, 306 N.Y.S.2d 153, _________________ _________________________ 156 (1969), aff'd., 27 N.Y.2d 718, 262 N.E.2d 416 (1970) _____ ("[P]arties to an agreement are presumed to act sensibly in regard to it and an interpretation that produces an absurdly harsh result is to be avoided"). Sixth, the sensible functional distinction the district court drew between replacements and modifications best comports with the terms of the lease as a whole. For example, the same section that accords accession rights to the lessor in respect to "repairs, replacements and substitutions" prescribes the lessee's duty to "maintain the Equipment in good operating order, repair, condition, and appearance. . . ." Finally, the district court supportably found that the "J" TCM's were "readily removable" and thus the sort of "additional equipment" UNUM was allowed to add under the terms of ____________________ 8Prior to the expiration of the lease, CSA attempted to sell the 200 Base computer at a time when it was about to be upgraded to 200E. Under CSA's accession theory, however, it could have acquired title to the "E" technology at no cost merely by awaiting its installation. 11 the lease. B. Doctrine of Accession B. Doctrine of Accession _____________________ Alternatively, CSA claims ownership of the enhanced technology under the common law doctrine of accession. The parties agree that Maine common law controls. Mathewson Corp. v. _______________ Allied Marine Indus., Inc., 827 F.2d 850, 853 n.3 (1st Cir. 1987) __________________________ (appellate court will accept parties' "expressed preference" and "implicit concession" as to controlling law, where "[t]hey have briefed the question in those terms and the district court ruled on that basis."); In re Pioneer, 729 F.2d 27, 31 (1st Cir. 1984). _____________ Under Maine law, three factors govern whether an accession occurs. [A] chattel is not merged into the realty unless (1) it is physically annexed, at least by juxtaposition, to the realty or some appurtenance thereof, (2) it is adapted to and usable with that part of the realty to which it is annexed, and (3) it was so ___ annexed with the intention, on the part of the person making the annexation, to make it a permanent accession to the realty. Franklin Property Trust v. Foresite, Inc., 489 A.2d 12, 14 (Me. _______________________ ______________ 1985) (citing Hayford v. Wentworth, 97 Me. 347, 350, 54 A. 940, _______ _________ 941 (1903)) (emphasis added). See In re Lyford, 22 B.R. 222, 224 ___ ____________ (Bankr. D. Me. 1982) (applying Hayford factors to determine _______ whether cab and chassis were accessions to truck). All three elements in the Hayford accession test must be met, but "special _______ prominence must be attached to the intention of the party making 12 the annexation." Id. The party asserting the accession claim ___ bears the burden of proof. Hayford v. Wentworth, 97 Me. 347, _______ _________ 350, 54 A. 940; Franklin Property Trust, 489 A.2d at 14. _______________________ The district court supportably found, on the basis of testimony it explicitly credited, that the time taken to remove the "J" TCM's and restore the original base technology was not out of proportion to the time required for an ordinary upgrade and therefore that the "J" TCM's were "readily removable." Thus, it was not clear error to conclude that no physical annexation of the technology occurred. See, e.g., Peckham v. Continental Cas. ___ ____ _______ _________________ Ins. _____ 13 Co., 895 F.2d 830, 840 (1st Cir. 1990) (citing Anderson v. City ___ ________ ____ of Bessemer City, 470 U.S. 564, 573-74 (1985)) (no "clear error" _________________ where district court adopts plausible view of evidence). Furthermore, no evidence was produced at trial that any party involved in the TCM installation ever anticipated, let alone that UNUM intended, that the TCM's would become accessions to the CSA- owned computer. The uncontradicted testimony was to the con- trary. Accordingly, the district court determination that CSA did not acquire the "J" TCM's by accession under Maine common law must be affirmed. The district court judgment is affirmed. _______________________________________ 14