USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 93-1366 GEORGE C. WILLIAMS, ET AL., Plaintiffs, Appellants, v. RICHARD E. POULOS, ET AL., Defendants, Appellees. ____________________ No. 93-1367 GEORGE C. WILLIAMS, ET AL., Plaintiffs, Appellees, v. RICHARD E. POULOS, ET AL., Defendants, Appellees, ____________________ RALPH A. DYER Intervenor, Appellant. ____________________ No. 93-1368 GEORGE C. WILLIAMS, ET AL., Plaintiffs, Appellees, v. RICHARD E. POULOS, ET AL., Defendants, Appellees, ____________________ RODNEY P. RODRIGUE Defendants, Appellants. ____________________ No. 93-1680 GEORGE C. WILLIAMS, ET AL., Plaintiffs, Appellees, v. RICHARD E. POULOS, ET AL., Defendants, Appellants. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Selya and Stahl, Circuit Judges, ______________ and Fuste,* District Judge. ______________ ____________________ Allen S. Rugg, with whom Ronald R. Massumi, Kutak, Rock & _______________ ___________________ _______________ Campbell, John S. Whitman, Richardson & Troubh, were on brief for ________ ________________ ____________________ plaintiffs-appellants George C. Williams, Allied Capital Corporation, Allied Investment Corporation, Allied Venture Partnership, Allied Capital Corporation II, David P. Parker, David Gladstone, Brooks H. Browne, Frederick L. Russell, Jr., and Thomas R. Salley, E. Stephen __________ Murray, with whom Murray, Plumb & Murray were on brief for intervenor- ______ ______________________ appellant Ralph A. Dyer. John A. McArdle, III, with whom Daniel G. Lilley and Daniel G. _____________________ _________________ _________ Lilley Law Offices, P.A., were on brief for defendants/appellees/ __________________________ cross-appellants Rodney P. Rodrique, Wayne E. Bowers, Sr. and John Robichaud. Peter J. DeTroy, III, with whom Norman, Hanson & DeTroy were on _____________________ ________________________ brief for defendants/appellees/cross-appellants Richard E. Poulos, John S. Campbell and Poulos & Campbell, P.A. ____________________ December 14, 1993 ____________________ ____________________ *Of the District of Puerto Rico, sitting by designation. STAHL, Circuit Judge. Following a six-day civil ______________ bench trial, the district court ruled that the former principal owners of Consolidated Auto Recyclers, Inc. ("CAR"), defendants Wayne Bowers, Rodney Rodrigue, and John Robichaud (hereinafter "the CAR defendants"), violated the federal and Maine anti-wiretap statutes when they intercepted and recorded telephone calls made by and to plaintiffs, who were employees or former employees of Allied Capital Corporation ("Allied") and certain of its subsidiaries and affiliates.1 See 18 U.S.C. 2511(1)(a) and 15 M.R.S.A. ___ 710(1).2 The court also held that counsel retained by the CAR defendants, defendants Richard E. Poulos and the law firm of Poulos, Campbell & Zendzian, P.A. (hereinafter "the Poulos defendants"), violated 18 U.S.C. 2511(1)(c) and (d) and 15 M.R.S.A. 710(3)(A) and (B) when they disclosed and used the ____________________ 1. For simplicity's sake, the term "Allied" should be construed as encompassing all corporate and individual plaintiffs, including intervenor Ralph A. Dyer. 2. 18 U.S.C. 2511(1)(a) is a provision of the federal anti-wiretap statute, found at Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510-2521. In conjunction with other statutory provisions, it creates criminal and civil liability for any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 15 M.R.S.A. 710(1) is a provision of the Maine anti- wiretap statute, found at 15 M.R.S.A. 709-713. In conjunction with other statutory provisions, it creates criminal and civil liability for any person who "intentionally or knowingly intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire or oral communication." -3- recordings of the telephone calls at issue with the requisite mens rea.3 As a result, the court enjoined all defendants ____ ___ "from further using and disclosing information contained in the subject interceptions except to obtain rulings regarding ____________________ 3. 18 U.S.C. 2511(c) and (d), in conjunction with other statutory provisions, create criminal and civil liability for any person who (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection; or (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . . 15 M.R.S.A. 710(3)(A) and (B), in conjunction with other statutory provisions, create criminal and civil liability for any person who A. Intentionally or knowingly discloses to any person the contents of any wire communication, knowing that the information was obtained through interception; or B. Intentionally or knowingly uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception. -4- 4 admissibility in [an] underlying suit [brought by the CAR defendants against plaintiffs]."4 See 18 U.S.C. 2520.5 ___ Each of the three sides to this controversy has appealed from various rulings made by the district court. Both the CAR defendants and the Poulos defendants challenge sundry factual findings and legal judgments, arguing essentially that their respective actions did not run afoul of Title III and the Maine anti-wiretap statute. Plaintiffs' primary claim is that the court's injunction does not sufficiently remedy the harm they have suffered and are continuing to suffer. After carefully reviewing the record and the parties' arguments, we affirm the judgment below. ____________________ 4. In the underlying suit, Bowers v. Allied Capital Corp., ______ _____________________ Civ. No. 91-0021-B (D. Me. filed January 1991) (Brody, J.) ("Bowers"), which was stayed pending resolution of the ______ instant case, the CAR defendants assert causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961-68, the Securities Exchange Act of 1934, 15 U.S.C. 78a-78kk, and a host of common law theories. Essentially, they contend that Allied entities and personnel brought about the demise of CAR through certain acts primarily committed in the summer of 1990. The particulars of the relationship between CAR and the Allied entities and personnel will be discussed more fully infra. _____ 5. Inter alia, 18 U.S.C. 2520 authorizes persons _____ ____ victimized by violations of 18 U.S.C. 2511(1)(a),(c), and (d) to recover, by means of a civil action, (1) appropriate equitable or declaratory relief; (2) actual or statutory damages; (3) punitive damages; and (4) litigation costs and a reasonable attorney's fee. -5- 5 I. I. __ BACKGROUND BACKGROUND __________ The following detailed recitation is derived from the factual findings made by the district court in conjunction with Allied's motion for preliminary injunctive relief, see Williams v. Poulos, 801 F. Supp. 867, 868-72 (D. ___ ________ ______ Me. 1992) ("Poulos I"), and after the conclusion of the bench ________ trial. See Williams v. Poulos, Civ. No. 92-0069-B, slip op. ___ ________ ______ at 3-10 (D. Me. February 4, 1993) ("Poulos II").6 _________ This case is but one in a series of civil lawsuits and bankruptcy proceedings which can be traced to the collapse of CAR. CAR was founded in 1988 in order to dismantle automobiles and resell used parts. By May 1990, CAR employed approximately one hundred and forty people and operated throughout New England and in the Atlantic provinces of Canada. Twenty people worked in CAR's East Vassalboro, Maine, headquarters, including Bowers, Rodrigue, and Robichaud, the CAR defendants. These three owned 95% of CAR's stock and were members of CAR's Board of Directors ("the Board"). In addition, Bowers was CAR's Chief Executive Officer ("CEO") and Treasurer, while Rodrigue served as CAR's President. ____________________ 6. The order and memorandum of opinion on the bench trial incorporates by reference the factual findings set forth in the order and memorandum of opinion on the motion for a preliminary injunction. See Poulos II, slip op. at 3. ___ _________ -6- 6 To finance its early growth and operations, CAR developed a banking relationship with Casco Northern Bank. In February 1990, Casco Northern refused to increase CAR's lines of credit. As a result, CAR found itself in a serious financial bind because it had already spent the additional money it expected to receive. Accordingly, CAR turned to Allied, a venture capital firm which had previously invested in it. Allied responded with a large infusion of capital that raised its total investment in CAR to approximately $4,500,000. Despite this additional funding, CAR was unable to resolve its financial difficulties. On May 29, 1990, Casco Northern declared CAR in default on its obligations. Two days later, Allied followed suit. On June 28, 1990, in an attempt to resolve the crisis, the CAR defendants entered into an agreement with Allied which came to be known as the "Midnight Agreement." Under its terms, Ralph A. Dyer was made CAR's CEO and Chairman of the Board, three representatives of Allied, plaintiffs George C. Williams, David Gladstone, and Frederick Russell, Jr., became members of the Board, and David Parker became an officer. The Agreement also provided that the CAR defendants would remain on the Board, that Bowers would retain his position as Treasurer, and that Rodrigue would continue as President. -7- 7 Meanwhile, in May 1990, the CAR defendants had commissioned Michael Leighton, who owned Probe Investigating Service, Inc. ("Probe"), to provide a system for electronically monitoring employee phone calls.7 The CAR defendants felt that a surveillance system was needed (1) to reduce CAR's telephone bills, and (2) decrease employee theft. At the time they installed the system, the CAR defendants apparently received impromptu advice from Attorney Nicholas Lanzilotta that "monitoring would not be illegal if notice was first given to the monitored employees." After examining CAR's telephone system, Leighton concluded that he lacked the skill and expertise to create an appropriate monitoring system. He therefore sought assistance from Jonathan Broome. Broome's principal business was repairing consumer electronics; he was not an authorized telephone system technician. Although Broome considered the project to be unusual, Leighton assured him of its legality. On or about June 17, 1990, Broome, working after hours along with CAR security officer David Fisher, installed a custom-designed monitoring system8 in CAR's East ____________________ 7. Leighton and Probe were also named as defendants in this action. At the close of trial, the district court granted their oral motions for judgment as a matter of law. Plaintiffs have not appealed these rulings. 8. Apparently, there was no commercially available system which could perform the intercepting and recording functions desired by the CAR defendants. -8- 8 Vassalboro headquarters. In its findings of fact, the district court described the system as follows: The system . . . consisted of small alligator clips attached to a microphone cable at one end and a "punch-down" at the other. The wires to all the extension lines in CAR's offices were assembled on the punch-down. Calls could be intercepted by attaching the alligator clips and microphone wire to a designated extension line on the punch-down. The system could only monitor one extension at a time. The monitoring system designed by Broome also involved an interface connecting the microphone cable to a VCR and a video camera. The VCR allowed the system to record calls for up to eight hours. The video camera recorded the view meter on the VCR, allowing a person to fast forward the VCR tape until the meter indicated the presence of audio information. The VCR, video camera and interface were mounted together on a plywood board and set up in an unused bathroom next to the area containing the punch-down. Connecting wires were run through and over a suspended ceiling. Poulos II, slip op. at 4-5. _________ At some point in June 1990, Rodrigue informed the managers at CAR that all telephone calls at CAR's offices would be subject to random monitoring and recording. He also instructed the managers to inform their subordinates of the new monitoring policy. At about the same time, Rodrigue directed employees to record long distance phone calls on provided telephone logs. The employees were told that the logging system was to be used in conjunction with the monitoring system to reduce costs. On June 29, 1990, -9- 9 Rodrigue told the new CEO, Dyer, that CAR had a system in place to deter employee phone abuse by randomly monitoring employee phone calls. David Fisher learned how to operate the monitoring system. At first, he was instructed by the CAR defendants to monitor the extension lines randomly. After a short time, however, the CAR defendants told him which lines to intercept. Fisher was further instructed to deliver the tapes of recorded conversations to Wayne Bowers each day. Bowers then made cassette tapes of those telephone conversations he wished to save. On June 21, 1990, Fisher was instructed to monitor the telephone line of CAR Chief Financial Officer Richard Lee, who had been hired on Allied's recommendation. Apparently, Rodrigue and Bowers doubted Lee's loyalty to CAR. A few weeks later, however, the monitoring system was attached to the phone line of Jim Starr, an accountant from an outside firm who had been assigned to audit CAR. The CAR defendants suspected that Starr was misusing the telephone system. During this same general time period, Dyer's relationship with the CAR defendants, which had been strained from the beginning, was rapidly deteriorating. By July 10, 1990, Rodrigue and Robichaud were openly feuding with him. On July 12, 1990, Dyer fired Rodrigue and Robichaud. About -10- 10 a week after the firing, Dyer obtained a temporary restraining order barring Rodrigue and Robichaud from the CAR premises and prohibiting them from conducting any business on the company's behalf. Meanwhile, on July 17 or 18, 1990, Dyer began occupying Starr's office and using Starr's telephone line. Between July 18, 1990, and July 25, 1990, a number of Dyer's telephone calls were intercepted and recorded. The CAR defendants admit that, by July 19, 1990, they were specifically targeting Dyer's conversations.9 On July 21, 1990, the CAR defendants met with attorneys Richard E. Poulos, John S. Campbell, and Paul F. Zendzian, the partners of Poulos, Campbell & Zendzian, P.A., to discuss possible legal representation in matters involving CAR, Allied, and Dyer.10 At that meeting, the existence of a tape containing recorded telephone conversations between Dyer and Allied employees and representatives was disclosed to the Poulos defendants. The Poulos defendants made no inquiry into either how the tape was obtained or whether ____________________ 9. Although not mentioned in the district court's findings of fact, the record reflects that telephone conversations involving Brooks Browne, an Allied employee working at CAR in late July 1990, also were intercepted and recorded. These conversations took place while Browne was using Dyer's telephone. 10. Zendzian was not named as a defendant in this action. Campbell, who was a defendant below, was adjudged by the trial court not to have violated either Title III or the Maine anti-wiretap statute. Plaintiffs have not appealed from this ruling. -11- 11 there was employee notice or consent. They did, however, advise the CAR defendants to boycott a Board meeting that was scheduled for July 23, 1990. That meeting, which was held telephonically so that the out-of-town Allied employees could participate, was taped by the CAR defendants. All monitoring and taping of telephone conversations at CAR's headquarters was discontinued on July 25, 1990. On that same date, audio cassettes of some of the conversations that had been taped were delivered to the Poulos defendants, who soon thereafter agreed to represent the CAR defendants in the Bowers lawsuit. See supra note 4. ______ ___ _____ Over the following six weeks, paralegals from the Poulos firm prepared transcripts of the tapes. On July 27, 1990, pursuant to a certificate filed by Dyer with the United States Bankruptcy Court, a Chapter 11 bankruptcy proceeding was initiated on behalf of CAR. Anthony Swenson was appointed Chapter 11 trustee for CAR on August 10, 1990. On August 14, 1990, Swenson fired Dyer and rehired Bowers, Rodrigue, and Robichaud. Subsequently, the bankruptcy proceeding was converted to Chapter 7. In early August 1990, Poulos asked Stuart W. Tisdale, an associate attorney in his office, to prepare a memorandum concerning the legality of intercepting wire communications. In discussing the research assignment with Tisdale, Poulos stated that Dyer knew about the taping in -12- 12 question. After reading Tisdale's memorandum, Poulos and Campbell were satisfied that at least some of the information from the tapes might be admissible as evidence or would be otherwise useful in the case against Allied. In the district court's view, however, they did not "follow through on their research on the issue of consent and the legality of the interceptions." Poulos II, slip op. at 8. Nor did they _________ "make an effort to determine directly whether Dyer and the other Allied employees whose conversations were intercepted knew of or consented to the monitoring." Id. Finally, the ___ Poulos defendants "did not consult with bar counsel or advise any court of the existence and use of the information derived from the telephone conversations." Id. ___ On September 3 and 4, 1990, Poulos read the transcripts of most of the recorded conversations that had been preserved. On October 31, 1990, he disclosed contents of the tapes to Daniel Amory and David Crocker, counsel to the CAR Chapter 11 trustee. In so doing, Poulos told Amory and Crocker that the tapes he possessed might have been criminally obtained. He also asked them to keep the existence and contents of the tapes strictly confidential. In November and December of 1990, Poulos again reviewed the tapes. In September, October, and early November of 1990, the Poulos defendants obtained a large number of documents -13- 13 previously delivered by Allied to CAR's Chapter 11 trustee. The documents were produced without any involvement of the Poulos defendants and without any connection to the existence of the taped telephone conversations. These documents included notes, memoranda, and other written records of telephone conversations that had been taped on July 18, 19, 20, and 23, 1990. In January 1991, the CAR defendants filed the Bowers lawsuit, seeking $63,000,000 in damages from Allied, ______ Dyer, and Leo Madden, a business associate of Dyer's. After the complaint was filed, all discovery was stayed until December 5, 1991. During January 1992, shortly after the discovery stay was lifted, Poulos took the depositions of Williams, Parker, Dyer, and Madden. Poulos used both the discovery documents pertaining to the taped conversations and the tapes of the conversations themselves in preparing for the aforementioned depositions. Following these depositions, Poulos revealed the existence of the tapes to counsel for Madden and Dyer. In so doing, he (1) told counsel that the tapes proved that Madden and Dyer had lied during their depositions, and (2) offered to settle with them. No settlement was reached between the parties, and the present lawsuit was filed by Allied on April 17, 1992. II. II. ___ STANDARD OF REVIEW STANDARD OF REVIEW __________________ -14- 14 Insofar as the parties are challenging determinations made by the district court prior to and in conjunction with the bench trial, our standard of review is familiar. Claimed errors of law are, of course, reviewed de __ novo. E.g., Dedham Water Co., Inc. v. Cumberland Farms ____ ____ ________________________ _________________ Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992); LoVuolo v. ___________ _______ Gunning, 925 F.2d 22, 25 (1st Cir. 1991). Findings of fact, _______ however, will not be set aside unless they are demonstrated to be clearly erroneous. Fed. R. Civ. P. 52(a); Dedham ______ Water, 972 F.2d at 457. In other words, we will give such _____ findings effect unless, after carefully reading the record and according due deference to the trial court's superior ability to judge credibility, we form "`a strong, unyielding belief that a mistake has been made.'" Dedham Water, 972 _____________ F.2d at 457 (quoting Cumpiano v. Banco Santander Puerto Rico, ________ ___________________________ 902 F.2d 148, 152 (1st Cir. 1990)). As a result, where there are two permissible views of the evidence, the interpretation assigned by the lower court must be adopted. Rodriguez- __________ Morales v. Veterans Admin., 931 F.2d 980, 982 (1st Cir. 1991) _______ _______________ (citing Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)). ________ _____________ The clearly erroneous standard also ordinarily applies when we review a trial court's resolution of mixed questions of law and fact. E.g., LoVuolo, 925 F.2d at 25; ____ _______ Henry v. Connolly, 910 F.2d 1000, 1003 (1st Cir. 1990). In _____ ________ such situations, however, we are obligated to determine -15- 15 whether the court's resolution was infected by legal error. See LoVuolo, 925 F.2d at 25. And, "`if a trial court bases ___ _______ its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.'" Id. (quoting Inwood Labs., Inc. v. ___ ___________________ Ives Labs., Inc., 456 U.S. 844, 855 n.15 (1982)).11 ________________ With regard to Allied's attack upon the nature and extent of the injunction issued by the district court, our framework for review is equally well-established. Just as a trial court's decision on whether to exercise its equitable powers is committed to its sound discretion, Taino Lines, _____________ Inc. v. M/V Constance Pan Atlantic, 982 F.2d 20, 24 (1st Cir. ____ __________________________ 1992), so too is its choice of equitable remedies, Rosario- ________ Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989) ______ _______________ (en banc). Thus, our role is to review only for an abuse of that discretion. Taino, 982 F.2d at 24. Underlying this _____ deferential standard is a recognition that, in exercising its equitable powers, the district court "`has had first-hand ____________________ 11. In a recent case, we explained our review standard for mixed questions in a slightly different manner: "The standard of review applicable to mixed questions usually depends upon where they fall along [a] degree-of-deference continuum: the more fact dominated the question, the more likely it is that the trier's resolution will be accepted unless shown to be clearly erroneous." In re Extradition of ____________________ Howard, 996 F.2d 1320, 1328 (1st Cir. 1993) (reviewing ______ findings made at extradition hearing) (citing United States ______________ v. Mariano, 983 F.2d 1150, 1158-59 (1st Cir. 1993); Roland M. _______ _________ v. Concord Sch. Comm., 910 F.2d 983, 990-91 (1st Cir. 1990), __________________ cert. denied, 111 S. Ct. 1122 (1991)). _____ ______ -16- 16 exposure to the litigants and the evidence and is in a considerably better position to bring the scales into balance than an appellate tribunal.'" Hiraldo-Cancel v. Aponte, 925 ______________ ______ F.2d 10, 13 (1st Cir.) (quoting Rosario-Torres, 889 F.2d at ______________ 323) (ellipses omitted)), cert. denied, 112 S. Ct. 637 _____ ______ (1991). Nonetheless, we will reverse if the court committed a clear error of law. See In re Boston and Maine Corp., 719 ___ ____________________________ F.2d 493, 495 (1st Cir. 1983), cert. denied, 466 U.S. 938 _____ ______ (1984); see also Feinstein v. Space Ventures, Inc., 989 F.2d ___ ____ _________ _____________________ 49, 51 (1st Cir. 1993) (reviewing preliminary injunction). It is against this backdrop that we evaluate the parties' claims. III. III. ____ DISCUSSION DISCUSSION __________ On appeal, the CAR and Poulos defendants together contend (1) that the court erred in rejecting their arguments that two statutory exceptions -- the "business extension" and "consent" exceptions -- shielded them from liability; and (2) that the court erroneously refused to admit certain expert testimony. In addition, the Poulos defendants alone assert (1) that the court erred in ruling that plaintiffs' claims for equitable relief against them were not moot; (2) that the court erred in determining that Poulos had acted with sufficient knowledge to have violated Title III and the Maine anti-wiretap statute; (3) that the court erred in rejecting -17- 17 their claim that the statutory "good faith" defense relieved them of liability; and (4) that the court erred in denying them a jury trial on these latter two issues. Plaintiffs' complaints essentially are (1) that the court made mistakes of law in fashioning equitable relief for the violations it found; (2) that the court erred in denying their Fed. R. Civ. P. 59(e) motion to amend judgment; (3) that the court erred in ruling that statutory damages under 18 U.S.C. 2520 are legal, and not equitable, in nature; and (4) that the court erred in holding that the CAR defendants were not liable for use and disclosure violations under 18 U.S.C. 2511(1)(c) and (d). We discuss each of these arguments in turn. A. Defendants' Arguments A. Defendants' Arguments _________________________ 1. Statutory Exceptions 1. Statutory Exceptions ________________________ As both the CAR and Poulos defendants point out, not all aural acquisitions of wire, oral, and electronic communications are illegal and give rise to liability under Title III and the Maine act. In fact, these statutes specifically delineate certain acquisitions that do not give ___ rise to such liability. Defendants argue that the district court erred in ruling that two of these defined exceptions -- the business extension and consent exceptions -- did not apply. Our review, however, persuades us that the court's rulings are supported by the record. -18- 18 a. The Business Extension Exception12 a. The Business Extension Exception12 ______________________________________ The business extension exception, often called the "extension telephone" exception, see, e.g., Campiti v. ___ ____ _______ Walonis, 611 F.2d 387, 392 (1st Cir. 1979), places outside _______ the reach of Title III the monitoring of communications carried out by certain types of equipment and done in the ordinary course of business. It derives from 18 U.S.C. 2510(4) and (5). Section 2510(4) defines the term "interception" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other _______ ___ ___ __ ___ __________ __________ __ _____ device." (Emphasis supplied). Section 2510(5), insofar as is ______ relevant, then defines "electronic, mechanical, or other device" in the following manner: (5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than -- _____ ____ (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) . . . furnished by [a] subscriber or user for connection to the facilities of [a wire or electronic communication] service and used in the ordinary course of its business[.] (Emphasis supplied). Thus, if the monitoring conducted by the CAR defendants had been effectuated by means of a ____________________ 12. The business extension exception is found only in the federal act. Thus, we confine our discussion in this section of the opinion to federal law. -19- 19 "telephone or telegraph instrument, equipment or facility, or any component thereof" which was both furnished by CAR for connection to the facilities of its communication service and used in the ordinary course of its business, defendants' actions would not constitute an interception and would be beyond the reach of Title III. The district court determined that the business extension exception did not apply for two reasons: (1) because "the subject conversations were intercepted and recorded by a device configured by someone other than a provider of electronic communication service"; and (2) because "a legitimate business purpose did not exist at the time the subject conversations were intercepted." See Poulos ___ ______ II, slip op. at 17. Perhaps recognizing the amount of __ deference owed to the court's resolution of this paradigmatic mixed question of law and fact, defendants do not expend a great amount of energy attacking the factual findings underpinning the court's conclusions. Instead, they argue that the court's ruling was infected by erroneous legal reasoning. More specifically, defendants assert that, with regard to its first stated reason, the court misapprehended the technical requirements of the statute, and, with regard to its second stated reason, the court misconstrued the term "ordinary course of business." -20- 20 We agree with defendants that, in concluding that the business extension exception did not apply, the court erred in its reasoning. Section 2510(5)(a) does not require that the acquisition device be configured by a provider of electronic communication service. Nor does it direct courts to conduct an inquiry into whether a "legitimate business purpose" for monitoring exists at the time of the challenged aural acquisition. Nonetheless, we believe the district court's ultimate determination, that the business extension exception does not apply, is sustainable. Simply put, we are at a loss to see how the monitoring system used here, consisting as it did of "alligator clips attached to a microphone cable at one end" and an "interface connecting [a] microphone cable to a VCR and a video camera" on the other, can be considered to be a "telephone or telegraph instrument, equipment or facility, or a[] component thereof."13 In so stating, we note that ____________________ 13. In support of its position that the CAR device should be so considered, defendants advance three arguments that are, at best, unpersuasive. First, defendants assert that the record evidence demonstrates that the monitoring device was comprised of standard electronic components which are "commonly used in telephone systems." Upon close scrutiny, however, it is clear that this assertion is premised solely upon an outrageous mischaracterization of the testimony of Jonathan Broome. Broome did not testify, as defendants suggest, that the components of the CAR system "are commonly ________ used in telephone systems." (Emphasis supplied). Instead, __ he answered the question, "So, these wires were not uncommon parts or components for use in various ways with the [sic] ____ telephone systems, were they?" by responding, "No. It was all -- you don't usually use balanced shielded audio cable -21- 21 the CAR system is factually remote from the telephonic and telegraphic equipment courts have recognized as falling within the exception at 18 U.S.C. 2510(5)(a). See, e.g., ___ ____ Epps v. St. Mary's Hosp., 802 F.2d 412, 415-16 (11th Cir. ____ _________________ 1986) (dispatch console installed by telephone company considered telephone equipment); Watkins v. L.M. Berry & Co., _______ ________________ 704 F.2d 577, 582-84 (11th Cir. 1983) (standard extension telephone implicitly considered telephone equipment); Briggs ______ v. American Air Filter Co., Inc., 630 F.2d 414, 416-20 (5th ______________________________ Cir. 1980) (same); James v. Newspaper Agency Corp., 591 F.2d _____ ______________________ 579, 581 (10th Cir. 1979) (monitoring device installed by ____________________ for telephone, but it is quite acceptable to." (Emphasis supplied). In other words, rather than testifying that the components are commonly used in telephone systems, Broome ________ __ stated that, though it was unusual, the components could _______ _____ acceptably be used with telephone systems. In our view, such ____ testimony is not helpful to defendants. Second, defendants claim that certain 1986 amendments to the federal anti-wiretap statute were intended to broaden the meaning of 18 U.S.C. 2510(5)(a) so as to include equipment such as the CAR monitoring device. This argument flagrantly misconstrues the purpose of the congressional action. The legislative history makes it apparent that the 1986 amendments were aimed at strengthening the statute by _____________ updating it to reflect nearly twenty years of telecommunications advances. See generally S. Rep. No. 99- ___ _________ 541, 99th Cong., 2d Sess. 1-11, reprinted in 1986 _________ __ U.S.C.C.A.N. 3555-65. Despite defendants' contrary urgings, there is absolutely no evidence in this history suggesting that Congress meant to expand the parameters of the business extension exception so as to embrace almost all wiretapping equipment. Finally, defendants seem to argue that the First Circuit, in Campiti, 611 F.2d at 392, read the "any telephone _______ or telegraph instrument, equipment or facility, or any component thereof" provision out of 2510(5)(a). We think it sufficient to state without elaboration that Campiti, when _______ fairly read in context, does no such thing. -22- 22 telephone company implicitly considered telephone equipment). Indeed, we think it self evident that the CAR system, far from being the type of exempt equipment contemplated by the authors of the business extension exception, is precisely the type of intercepting device Congress intended to regulate heavily when it enacted Title III. We recognize that it is not ordinarily the province of appellate courts to make findings of fact or to resolve, in the first instance, mixed questions of law and fact. Yet, where only one resolution of a predominantly factbound question would, on a full record, be sustainable, courts of appeals can, and often should, decline to remand where there has been an error committed. See Dedham Water, 972 F.2d at ___ ____________ 463; see also In re Two Appeals Arising Out of the San Juan ___ ____ _______________________________________________ Plaza Hotel Fire Litigation, 994 F.2d 956, 968-69 (1st Cir. ____________________________ 1993) (appellate courts may eschew remand where remanding would be an empty exercise); Societe Des Produits Nestle, ______________________________ S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. ____ ____________________ 1992) (where trial court "supportably `made the key findings of fact' but applied the wrong rule of law, the court of appeals ha[s] the power, in lieu of remanding, simply to regroup the findings `along the proper matrix'") (quoting United States v. Mora, 821 F.2d 860, 869 (1st Cir. 1987)). _____________ ____ Here, given the trial court's findings regarding the nature of the monitoring device, the only sustainable ruling would -23- 23 be that the device was not a "telephone or telegraph instrument, equipment or facility, or a component thereof," and therefore not within the parameters of the business extension exception. Accordingly, we reject the argument that defendants are protected by this exception.14 b. The Consent Exception b. The Consent Exception _________________________ Both the federal and Maine acts specifically exempt from their prohibitions the interceptions of telephone calls where one or more of the conversants has consented to or, in the case of the Maine act, previously authorized the interception. See 18 U.S.C. 2511(2)(d) and 15 M.R.S.A. ___ 709(4)(C).15 As we have made clear, consent under Title ____________________ 14. In their brief, the CAR defendants conclude their argument that the business extension exception applies with a very short equitable argument that their "good faith" reliance on the advice of others, including counsel, in installing the monitoring system should absolve them from liability. They do not, however, adduce any authority in support of this novel proposition. Moreover, in the course of rebuffing defendants' business extension exception argument, the district court supportably found that the interceptions here at issue were not effectuated to further the original purpose of the monitoring system. Defendants do not, and cannot, seriously contest this finding. Thus, the alleged good faith of the CAR defendants in originally __ __________ installing the system is irrelevant. __________ ___ ______ 15. In relevant part, 18 U.S.C. 2511(2)(d) provides: It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where . . . one of the parties to the communication has given prior consent to such interception . . . . Similarly, 15 M.R.S.A. 709(4)(C) excludes from the reach of the statute those interceptors "given prior -24- 24 III16 need not be explicit; instead, it can be implied. See Griggs-Ryan v. Smith, 904 F.2d 112, 116 (1st Cir. 1990). ___ ___________ _____ Implied consent is not, however, constructive consent. Id. ___ "Rather, implied consent is `consent in fact' which is inferred `from surrounding circumstances indicating that the party knowingly agreed to the surveillance.'" Id. at 116-17 _________ ______ ___ (quoting United States v. Amen, 831 F.2d 373, 378 (2d Cir. ______________ ____ 1987), cert. denied, 108 S. Ct. 1573 (1988)) (brackets _____ ______ omitted) (emphasis supplied). In light of the prophylactic purposes of Title III, implied consent should not be casually inferred. See id. at 117. ___ ___ Here, the record reflects and the district court found that Ralph Dyer was told of the "monitoring" of CAR employee telephone calls.17 The record is not clear, however, as to whether Dyer was informed (1) of the manner -- i.e., the intercepting and recording of telephone ____________________ authority by the sender or receiver." 16. Because the "consent" standard under Title III is certainly no more stringent than the "prior authority" standard set forth in 15 M.R.S.A. 709(4)(C), see supra note ___ _____ 15, and because, as will be demonstrated below, we rule that the district court did not clearly err in finding that the consent standard had not been met, we need only discuss the federal act in this section of the opinion. 17. Defendants' consent arguments involve only the actions of Ralph Dyer, and are not directed at the district court's summary judgment ruling that the consent exception does apply to the conversations involving Brooks Browne. Accordingly, we limit our discussion to whether Dyer consented to interceptions of his telephone conversations. -25- 25 conversations -- in which this monitoring was conducted; and (2) that he himself would be subjected to such monitoring. There was testimony tending to indicate that he was so informed, which the district judge apparently chose not to credit, and testimony tending to indicate that he was not. In our view, the latter testimony, far from being incredible, was highly plausible.18 Thus, there is no basis for us to conclude that the district court clearly erred in finding that Dyer was not told of the manner in which the monitoring was conducted and that he himself would be monitored. Cf. ___ Rodriguez-Morales, 931 F.2d at 982 (district court's finding _________________ should not be disturbed where there are two permissible views of the evidence). And, without at least this minimal __ _____ knowledge on the part of Dyer, we do not see how his consent in fact to the monitoring could be inferred from this record. Cf. Griggs-Ryan, 904 F.2d at 117 (implied consent inferred ___ ___________ where defendant was informed (1) that all incoming calls, (2) on a particular line, (3) would be tape recorded). Accordingly, we reject the contention that the court erred in finding that defendants are not protected by the consent exception. 2. Refusal to Admit Expert Testimony 2. Refusal to Admit Expert Testimony _____________________________________ ____________________ 18. It is difficult to believe that the newly-installed CEO and Chairman of the Board would have assented to the intercepting and recording of his conversations by subordinates with whom he was engaged in a struggle for power. -26- 26 Defendants also assert that the court erred in refusing to admit, pursuant to Fed. R. Evid. 702, the testimony of their expert, G. Robert Blakey.19 This argument does not require extended discussion. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." It is settled that "`the admission of expert testimony under [Rule] 702 is within the discretion of the district court and will be reversed only for an abuse of that discretion.'" Navarro de __________ ____________________ 19. Blakey, described by the CAR defendants as "one of the drafters and architects" of Title III, would, in defendants' words, "[have] address[ed] the many mixed questions of law and fact which [arose] in this action . . . ." Indeed, a review of the Poulos defendants' offer of proof regarding Blakey reveals that, if he had been allowed to testify, Blakey would have opined on virtually all of the mixed questions of law and fact in this litigation. Specifically, Blakey would have testified, inter alia, (1) that the CAR _____ ____ defendants' monitoring equipment was not a "device" as defined by 18 U.S.C. 2510(5)(a) or 15 M.R.S.A. 709(3); (2) that the monitoring equipment "was telephone `equipment or facility'" [sic], see 18 U.S.C. 2510(5)(a); (3) that the ___ monitoring at issue was done "within the ordinary course of [CAR's] business," see id.; (4) that the actions and ___ ___ activities of the Poulos defendants "were carried out in a good faith reliance on a statutory authorization within the terms of 18 U.S.C. 2520(d)"; and (5) that "under all the relevant facts and circumstances, attorneys in the position of the Poulos defendants . . . would not have had `reason to know' that the [intercepted] information was obtained in violation of law." -27- 27 Cosme v. Hospital Pavia, 922 F.2d 926, 931 (1st Cir. 1991) _____ ______________ (quoting Forrestal v. Magendantz, 848 F.2d 303, 305 (1st Cir. _________ __________ 1988)). Here, the court granted plaintiffs' motion to exclude Blakey by stating: "I'm satisfied with regard to expert witnesses in this case that expert witnesses are not appropriate, . . . and I have excluded both the plaintiffs' and the defendants' experts by appropriate action on their respective motions." Thus, it appears that the court, as factfinder, concluded that it could "understand the evidence [and] determine [the] fact[s] in issue" without the assistance of experts. Our review of this record persuades us that the court acted well within its discretion in so concluding.20 Accordingly, we reject defendants' contention that the court erred in excluding Blakey's testimony. 3. Mootness 3. Mootness ____________ The Poulos defendants assert that plaintiffs' claims against them became moot when plaintiffs amended their ____________________ 20. The court's decision rests upon especially firm ground with regard to Blakey. The Poulos defendants' offer of proof, see supra note 19, reveals that virtually all of ___ _____ Blakey's testimony would have been opinion testimony regarding (1) the state of mind of the Poulos defendants, and (2) the applicability of certain statutory provisions to the facts of this case. Leaving aside overall admissibility concerns, it is apparent that such testimony is not based upon "scientific, technical, or . . . specialized knowledge" likely to be lacking in the able district judge who conducted this bench trial. -28- 28 complaint so as to drop their claims for monetary damages.21 In so doing, they point to the fact that, as the CAR defendants' attorneys, they would be bound by any injunction or restraining order issued against the CAR defendants alone. See Fed. R. Civ. P. 65(d).22 In the ___ Poulos defendants' view, the fact that they would be so bound, when combined with the fact that the trial was solely for equitable relief, means that complete relief could have been afforded to plaintiffs without their presence as named defendants. Thus, the argument concludes, after the damages claims were dropped, there was no longer a case or controversy between plaintiffs and themselves. We cannot agree with the Poulos defendants' argument. Among its infirmities, this argument fails to recognize that plaintiffs sought from the Poulos defendants two forms of relief other than an injunction. First, _____ ____ plaintiffs sought a declaration that the Poulos defendants ___ ______ __________ themselves, irrespective of their relationship with the CAR __________ ____________________ 21. In their original complaint, plaintiffs sought declaratory and injunctive relief; actual, statutory, and punitive damages; and attorneys' fees. Eventually, however, plaintiffs amended their complaint so as to dismiss all their damages claims. As a result, the case was reduced to a completely equitable proceeding tried only before the district court. 22. The part of Rule 65(d) upon which the Poulos defendants rely states: "Every order granting an injunction and every restraining order . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys . . . ." -29- 29 defendants, had violated, inter alia, the disclosure and use _____ ____ provisions of Title III and the Maine act.23 And second, plaintiffs sought from the Poulos defendants the attorneys' fees they had incurred in the course of protecting their statutorily created rights. Thus, even if we were to endorse for the sake of argument the dubious premise upon which the Poulos defendants' argument rests, we are still compelled to conclude that there was a very live case and controversy between plaintiffs and the Poulos defendants. Accordingly, we reject the contention that plaintiffs' claims against the Poulos defendants were mooted when they dropped their damages claims.24 4. Poulos's Knowledge 4. Poulos's Knowledge ______________________ ____________________ 23. Despite the fact that it is specifically made available by 18 U.S.C. 2520(b)(1), the Poulos defendants contend that such a declaration, standing alone, would be "completely inappropriate" because it would have no future application. We are not persuaded by this argument. The Poulos defendants are the attorneys of record for the CAR defendants in the Bowers litigation. Surely a declaration that the Poulos ______ defendants had disclosed and used the contents of intercepted communications, relevant to the Bowers lawsuit, in violation ______ of Title III and the Maine act would be useful to plaintiffs in any motion they might file to disqualify the Poulos defendants in that case. 24. The Poulos defendants also assert that the injunction issued against them was improper because plaintiffs were not in danger of suffering "actual or imminent, not `conjectural' or `hypothetical'" harm from them. See Whitmore v. Arkansas, ___ ________ ________ 495 U.S. 149, 155 (1990) (elaborating upon Article III's "case or controversy" requirement) (quoting City of Los _____________ Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)). In light of _______ _____ the imminence of Bowers and the fact that the Poulos ______ defendants may still participate in it, we find this line of argument entirely unconvincing. -30- 30 The Poulos defendants next contend that the district court clearly erred when, in determining that they had violated the disclosure and use provisions of Title III, it found that Richard Poulos knew or had reason to know that the interceptions at issue had been effectuated in violation of Title III. See 18 U.S.C. 2511(c) and (d), supra note ___ _____ 3.25 More particularly, they argue that the judge clearly erred in implicitly deciding that plaintiffs had met their burden of proving that Poulos knew or had reason to know that the statutory business extension and consent exceptions did not apply to the interceptions. After carefully considering this argument, we are not convinced. It is settled that a person has not committed a disclosure or use violation under Title III unless s/he "knew or had reason to know that the interception [by which the ____________________ 25. In the course of so ruling, the court also found that the Poulos defendants had violated the disclosure and use provisions of the Maine act. See 15 M.R.S.A. 710(3)(A) and ___ (B), supra note 3. The Poulos defendants also contest this _____ finding, arguing (1) that the Maine act required the court to find that they had disclosed and used the intercepted information "actually knowing" that it had been illegally _________ obtained, and (2) that the evidence could not support such a finding. This argument is built on a faulty legal foundation. Section 710(3)(A) and (B) do not require knowledge that the information was illegally intercepted; they merely require knowledge "that the information was obtained through interception [as that term is defined by the Maine act]." See supra note 3. Accordingly, because of its ___ _____ defective premise, and because a thorough review of the record convinces us that the court did not clearly err in implicitly finding that the Poulos defendants knew that the information they disclosed and used had been "obtained through interception," we reject this argument. -31- 31 information which was disclosed or used had been obtained] itself was in violation of Title III." United States v. ______________ Wuliger, 981 F.2d 1497, 1501 (10th Cir. 1992); see also _______ ___ ____ Thompson v. Dulaney, 970 F.2d 744, 749 (10th Cir. 1992). In ________ _______ other words, "knowledge or reason to know of the illegality is an element of the offense." Wuliger, 981 F.2d at 1501. _______ Thus, in a civil action, a plaintiff must demonstrate "1) the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of Title III." Thompson, 970 F.2d at 749; see also Cheek v. United States, ________ ___ ____ _____ _____________ 498 U.S. 192, 199-200 (1991) (making clear that the common law presumption that every person knows the law ordinarily applies when courts construe criminal statutes). This demonstration includes a showing that any statutory exceptions asserted by a defendant do not, in fact, apply. See Thompson, 970 F.2d at 749. ___ ________ Here, we perceive no clear error in the district court's implicit findings that the statutory defenses did not apply. Insofar as the Poulos defendants are challenging the court's finding regarding the business extension exception, we again observe that the exception applies only when, inter _____ alia, the aural acquisition at issue is effectuated by means ____ -32- 32 of a "telephone or telegraph instrument, equipment or facility, or a component thereof." See 18 U.S.C. ___ 2510(5)(a), supra at 19. As noted earlier, we think it _____ evident that the monitoring equipment used by the CAR defendants cannot be so characterized. Moreover, there is no suggestion that Poulos misapprehended the nature of the equipment the CAR defendants used to monitor plaintiffs' calls. Given these facts, we discern no basis for upsetting the court's finding that Poulos knew or had reason to know that the business extension exception would not apply to the intercepted calls. Similarly, insofar as the Poulos defendants are contesting the court's finding regarding the consent exception, we again note that consent, even if implied, must be "`consent in fact.'" See Griggs-Ryan, 904 F.2d at 116-17 ___ ___________ (quoting Amen, 831 F.2d at 378). As observed earlier, there ____ is record evidence tending to indicate that Dyer26 never was informed (1) of the manner in which the monitoring was being conducted; and (2) that he himself would be subjected to such monitoring. Moreover, there is record evidence from which a rational factfinder could have found, under a preponderance of the evidence standard, that Poulos was not ____________________ 26. See supra note 17. ___ _____ -33- 33 laboring under the assumption that Dyer had been so informed.27 Thus, we can discern no clear error in the district court's finding that Poulos knew or had reason to know that the consent exception would not apply to the intercepted calls. Accordingly, we reject the Poulos defendants' challenge to the court's finding that Poulos knew or had reason to know that the interceptions violated Title III. 5. The Poulos Defendants' Good Faith Defense 5. The Poulos Defendants' Good Faith Defense _____________________________________________ The Poulos defendants' next argument, that the good faith defense provided for in 18 U.S.C. 2520(d)28 exonerates them, is a variation on this same theme. In essence, the Poulos defendants claim that Poulos, in good faith, believed that the business extension and consent exceptions applied and were "statutory authorization[s]" for the wiretapping that occurred. Thus, they assert, they have a complete defense against plaintiffs' civil claims. Again, we do not agree. ____________________ 27. For example, in response to a question at trial regarding a journal entry made by Dyer, Poulos testified: "You people didn't know about and Dyer didn't know about the ___ ____ ______ ____ _____ ___ wiretaps on August 25 or so and when he's talking about sue - ________ - [sic]." Also, when Poulos disclosed the contents of the tapes to counsel for CAR's Chapter 11 trustee, he informed them that the tapes might have been criminally obtained. 28. In relevant part, 18 U.S.C. 2520(d) states: "A good faith reliance on . . . a statutory authorization . . . is a complete defense against any civil or criminal action brought under this chapter or any other law." -34- 34 As we have stated, the district court sustainably found that Poulos disclosed and used the contents of intercepted communications despite, at the very least, having had reason to know that the interception was effectuated in violation of Title III. Therefore, even if we assume arguendo that the term "statutory authorization" in 2520(d) ________ encompasses the business extension and consent exceptions (a matter that we do not now decide), it is evident that any belief on Poulos's part that these exceptions did apply could have been premised only upon mistakes of law. And, as we have held, nothing in 2520(d) supports a conclusion that the good faith defense applies where a defendant mistakenly __________ believes that there exists a statutory authorization for the wiretapping. See Campiti, 611 F.2d at 394-95 (mistaken ___ _______ belief that statutory exceptions apply does not give rise to a good faith defense);29 see also Heggy v. Heggy, 944 F.2d ___ ____ _____ _____ 1537, 1542 (10th Cir. 1991) ( 2520(d) does not embrace mistake of law), cert. denied, 112 S. Ct. 1514 (1992). _____ ______ ____________________ 29. The Poulos defendants point out that the term "statutory authorization" was added to 2520(d) after Campiti was _______ handed down and assert, without any elaboration, that this means that 2520(d) "may in fact now exempt a mistake of law." Given the dearth of contexts where subjective mistakes of law allow a defendant to avoid liability, see Cheek, 498 ___ _____ U.S. at 199-200, we find this perfunctorily made argument to be highly suspect. At any rate, we deem it waived, see ___ United States v. Innamorati, 996 F.2d 456, 468 (1st Cir. ______________ __________ 1993) (issues adverted to in a perfunctory manner and without developed argumentation are deemed waived on appeal), cert. _____ denied, 62 U.S.L.W. 3320 (Nov. 1, 1993). ______ -35- 35 Accordingly, we reject as meritless the Poulos defendants' argument that they are protected by the good faith defense of 2520(d).30 6. Entitlement to Jury Trial 6. Entitlement to Jury Trial _____________________________ Finally, in one sentence, the Poulos defendants assert: Due to the professional implications, the exposure to substantial attorneys [sic] fees, the [district] court's decision to determine whether there was a use and disclosure violation under both [Title III] and the Maine Act, and the criminal nature of the statute involved, [the Poulos defendants] should have been accorded a jury trial on the issues of whether they used the tapes knowing or with reason to know of the illegality and the good-faith defense. They do not, however, explain how the presence in this case of "professional implications," an attorneys' fees request, use and disclosure issues, and the fact that Title III also contains criminal provisions renders this action an essentially legal one. Nor do they cite to any authority from which we can derive such an inference. As such, their argument is perfunctory and we will not address it. See ___ Innamorati, 996 F.2d at 468.31 __________ ____________________ 30. Because 2520(d) does not shield the Poulos defendants from plaintiffs' Title III claims, it also obviously does not, despite their argument to the contrary, shield them from plaintiffs' claims under the Maine act. 31. The Poulos defendants do, without elaboration, advert to authority which enunciates the settled rule that an action for declaratory relief which is essentially legal in nature -36- 36 B. Plaintiffs' Arguments B. Plaintiffs' Arguments _________________________ 1. Scope of the Injunction 1. Scope of the Injunction ___________________________ Plaintiffs' primary argument on appeal is their complaint concerning the reach of the injunction issued by the district court. The argument has three components: (1) that the court abused its discretion in permitting defendants to disclose and/or use the intercepted recordings in Bowers; ______ (2) that the court also abused its discretion in failing to enjoin the Bowers litigation; and (3) that the court ______ erroneously thought itself restricted to the relief provided for in 18 U.S.C. 251532 when it issued the injunction. We address each branch of plaintiffs' argument in turn. a. Disclosure and/or Use of the Recordings in a. Disclosure and/or Use of the Recordings in ___________________________________________________ Bowers Bowers ______ The first aspect of plaintiffs' argument is not difficult to comprehend. They contend that the court's ____________________ gives rise to the right to a jury trial. See, e.g., Simler ___ ____ ______ v. Conner, 372 U.S. 221, 223 (1963); Beacon Theatres, Inc. v. ______ _____________________ Westover, 359 U.S. 500, 504 (1959). They do not, however, ________ make any attempt to demonstrate the applicability of this authority to the facts of this case. Accordingly, we deem __ ___ _____ __ ____ ____ their efforts insufficient to preserve this issue for appellate review. See Innamorati, 996 F.2d at 468. ___ __________ 32. In relevant part, 18 U.S.C. 2515 provides: Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if disclosure of that information would be in violation of this chapter. -37- 37 injunction, insofar as it permits defendants to disclose and/or use the contents of the tapes for admissibility determinations in Bowers, must be reversed. In plaintiffs' ______ view, Title III33 simply does not allow for any disclosures and/or use of illegally intercepted material in civil cases. After careful consideration, we disagree with this position. In making their argument, plaintiffs rely upon the fact that Title III, without exception, makes criminal "disclosures" and/or "uses" of illegally intercepted material. In our view, however, there are at least two reasons why the lack of any such explicit exception does not dictate the conclusion reached by plaintiffs. First, we think it important to note: A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. 2A Norman J. Singer, Sutherland Statutory Construction, __________________________________ 46.05, at 103 (5th ed. 1992). Here, if we were to interpret the criminal provisions of Title III in the manner suggested by plaintiffs, we would render the statute unenforceable.34 ____________________ 33. Again here, the parties' discussion of the issue centers around Title III. Therefore, we confine our analysis to federal law. 34. After all, a court (or jury) would almost never be able to determine whether an interception violated Title III without having the interception "disclosed" in court and -38- 38 Thus, we must reject plaintiffs' interpretation as violative of a fundamental tenet of statutory construction. Moreover, we think that Congress, in enacting 2515, see supra note 32, made clear its endorsement of ___ _____ disclosures and/or uses of illegally intercepted material for the adjudicatory purposes contemplated by the district court. As noted, 2515 bans the introduction into evidence of both illegally intercepted material and any evidence derived therefrom. Implicit in this ban, we believe, are two assumptions: (1) that the intercepted material will be presented to a court or jury for an initial adjudication of whether it was acquired illegally; and (2) that a court will thereafter determine whether other evidence was derived from the intercepted evidence. Simply put, we are at a loss to see how these functions could be performed without the types of adjudicatory "disclosures" and/or "uses" that plaintiffs view as banned by Title III. Accordingly, we reject the argument that the court erred in permitting future disclosures and/or uses of the recordings and transcriptions here at issue for the limited purpose of aiding it in the making of admissibility determinations in Bowers. ______ Despite the fact that the court's injunction explicitly made reference only to disclosures and/or uses in ____________________ "using" this interception to inform its determination. -39- 39 the context of admissibility determinations, the parties also disagree over whether the tapes at issue can be used "for purposes of impeachment" in Bowers. Because we believe that ______ this is an important issue certain to arise during the course of that litigation, we address it at this time. We start with the obvious. As we have observed, Title III makes criminal the intentional disclosure and/or use of information obtained through unauthorized interceptions of wire, oral, or electronic communications (when the discloser/user knows or has reason to know that the interception was unauthorized). See 18 U.S.C. 2511(c) and ___ (d), supra note 3; see also Gelbard v. United States, 408 _____ ___ ____ _______ ______________ U.S. 41, 46 (1972). It also generally reserves as a remedy to anyone subjected to an unlawful interception "such . . . equitable or declaratory relief as may be appropriate." See ___ 18 U.S.C. 2520(b), supra note 5. We think it apparent, _____ therefore, that, in order to provide aggrieved plaintiffs with "appropriate" relief, courts ordinarily should completely enjoin persons in possession of illegally intercepted information from disclosing and/or using that information. With regard to how, if at all, illegally intercepted communications may be disclosed and/or used as __ evidence in court proceedings, Title III is more explicit. ________ As noted above, 2515 states that "no part of the contents -40- 40 of such communication and no evidence derived therefrom may be received in evidence . . . ." See supra note 32. Despite ___ _____ the unequivocal nature of this statutory language, however, several courts, including this one, have allowed the government to disclose and use the contents of illegally __________ intercepted communications in order to impeach testifying criminal defendants. See United States v. Vest, 813 F.2d ________ ___ _____________ ____ 477, 484 (1st Cir. 1987); United States v. Winter, 663 F.2d _____________ ______ 1120, 1154 (1st Cir. 1981), cert. denied, 460 U.S. 1011 _____ ______ (1983); see also, e.g., United States v. Echavarria-Olarte, ___ ____ ____ _____________ _________________ 904 F.2d 1391, 1397 (9th Cir. 1990); United States v. Caron, _____________ _____ 474 F.2d 506, 508 (5th Cir. 1973). In so doing, these courts, either explicitly or implicitly, have relied upon a passage in the legislative history of Title III which indicates a congressional desire to incorporate, inter alia, _____ ____ the impeachment exception of "search and seizure law"35 into the Title III calculus. See generally Caron, 474 F.2d ___ _________ _____ at 510 (interpreting the meaning of S. Rep. No. 1097, 90th ____________________ 35. In criminal law, evidence obtained in violation of the Fourth Amendment can be used for the limited purpose of attacking a testifying defendant's credibility. Walder v. ______ United States, 347 U.S. 62, 65 (1954). It can, however, only _____________ be used to impeach on matters "plainly within the scope of the defendant's direct examination." United States v. ______________ Havens, 446 U.S. 620, 627 (1980). Moreover, the tainted ______ evidence can only be used to impeach the criminal defendant him/herself; it cannot be used to impeach other witnesses, even other defense witnesses. James v. Illinois, 493 U.S. _____ ________ 307, 313 (1990). -41- 41 Cong., 2d Sess. at 96, reprinted in 1968 U.S.C.C.A.N. 2184- _________ __ 85).36 Every federal court that has passed on the question has, however, declined to extend this impeachment exception to civil actions brought under Title III. See, e.g., ___ ____ Wuliger, 981 F.2d at 1506; Anthony v. United States, 667 F.2d _______ _______ _____________ 870, 879 (10th Cir. 1981), cert. denied, 457 U.S. 1133 _____ ______ (1982). In so doing, these courts, have taken note of (1) the "overriding concern for protection of privacy . . . [Title III] sets out," Wuliger, 981 F.2d at 1506, and (2) the _______ fact that 2515, by its terms, allows for no exceptions. They, therefore, have proceeded from the premise that "`what is not permitted [by the Act] is forbidden.'" Id. (quoting ___ Fultz v. Gilliam, 942 F.2d 396, 401 (6th Cir. 1991)). Then, _____ _______ these courts have observed that the allowance of an impeachment exception derives from the references in the legislative history to "search and seizure law" and the Supreme Court's decision in Walder. See S. Rep. No. 1097, ______ ___ 90th Cong., 2d Sess. at 96, reprinted in 1968 U.S.C.C.A.N. at _________ __ 2184. Thus, because "[n]ormal search and seizure laws have arisen in the context of the Fourth Amendment which is directed against the government, not against private ____________________ 36. The legislative history's reference to the impeachment exception is made indirectly by means of an approving citation to Walder, the case wherein the impeachment ______ exception was created. See supra note 35. ___ _____ -42- 42 individuals," Anthony, 667 F.2d at 879, and because the _______ Fourth Amendment does not apply in civil actions not involving the government, see id., these courts have, as ___ ___ stated above, declined to recognize an impeachment exception to 2515 in civil proceedings, see id.; see also Wuliger, ___ ___ ___ ____ _______ 981 F.2d at 1506. We find this line of reasoning persuasive,37 and accordingly limit the impeachment exception of 2515 to criminal actions brought pursuant to Title III. Therefore, it follows that the illegal interceptions (and their transcriptions) at issue in this litigation cannot, pursuant to the criminal impeachment exception, be introduced into evidence for impeachment purposes in Bowers. ______ ____________________ 37. In an attempt to counteract this authority, the Poulos defendants contend (1) that Walder and its progeny do not ______ explicitly state that the impeachment exception should be available only in criminal cases, and (2) that the concerns underlying the exception (e.g., the prevention of untruthful testimony) are equally applicable in the civil context. While this argument has some force, we think, in light of (1) the unequivocal language of 2515, (2) the broad remedial purposes of Title III, and (3) the restrictions the Supreme Court has put on the impeachment exception, see supra note ___ _____ 35, that the exception we have read into 2515 must be strictly construed. Cf. Vest, 813 F.2d at 480-84 (declining ___ ____ to read the legislative history at issue as empowering courts to read further excep-tions into 2515). As we have noted, the exception derives from a specific reference to "search and seizure law" and a citation to Walder, neither of which ______ is directly applicable in the civil context. Thus, any ________ application of the exception to civil cases would be based upon extrapolation. In light of the three above-stated factors which incline us towards a strict construction of the exception, we simply do not believe that such an extrapolation would be appropriate in this instance. -43- 43 b. Failure to Enjoin Bowers b. Failure to Enjoin Bowers ____________________________ The second component of plaintiffs' argument has two parts: that, in failing to enjoin Bowers, the district ______ court (1) erroneously relied upon Fourth Amendment "independent source" jurisprudence,38 and (2) erroneously overlooked the fact that Title III "flatly" bans disclosures and uses of illegally intercepted material.39 In our view, plaintiffs misconstrue the approach taken by the district court. With respect to plaintiffs' first claim, the court did not hold that the evidence derived from the illegal interceptions would be admissible in Bowers pursuant to the ______ independent source rule.40 Instead, the court found that ____________________ 38. The independent source rule "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. ___ ________ 431, 443 (1984); see also United States v. Silvestri, 787 ___ ____ ______________ _________ F.2d 736, 739 (1st Cir. 1986), cert. denied, 487 U.S. 1233 _____ ______ (1988). 39. To be more specific, the second part of plaintiffs' argument is that, to the extent that the court may have "balanced the equities" in deciding not to enjoin Bowers, it ______ was in error. Cf. Burlington R.R. Co. v. Blair, 957 F.2d ___ ____________________ _____ 599, 601-02 (8th Cir.) (indicating that, in considering the propriety of injunctive relief, it is not the role of the courts to balance the equities between the parties where Congress has flatly banned the conduct sought to be enjoined), cert. denied, 113 S. Ct. 69 (1992). _____ ______ 40. We recognize that the court did make reference to the independent source rule in denying plaintiffs' Fed. R. Civ. P. 59(e) motion to amend the judgment. We discuss the propriety of this reference in the next section of this opinion. See infra at 48-50. ___ _____ -44- 44 "the evidence presented at trial demonstrated the existence of information upon which the allegations in Bowers v. Allied ______ ______ could be based independent of the subject tapes." Poulos II, ___________ __ ___ _______ _____ _________ slip op. at 29-30 (emphasis supplied). In other words, the court found that evidence other than that which was on the _____ ____ tapes (and "in no way attributable to the existence of the subject tapes," see id. at 30) could support the lawsuit. ___ ___ Thus, the independent source rule, which is a means for admitting evidence springing from independent sources despite the fact that the evidence replicates tainted evidence, was not a basis for the district court's holding. With regard to plaintiffs' second claim, we believe it sufficient to state that the court's injunction does not contravene the purposes of Title III.41 Contrary to plaintiffs' assertions, Title III does not "flatly" ban all ___ disclosures and uses of illegally intercepted communications. Instead, as we have explained, it generally bans such _________ disclosures and uses while, either explicitly or implicitly, ____________________ 41. We are aware that plaintiffs' argument ties in with their general concern, expressed throughout their brief, that allowing Bowers to proceed will undermine the purposes of ______ Title III and the Maine act. If, however, there is independent evidence upon which the allegations of Bowers are ______ premised, and if, as we shall explicitly urge it to do, see ___ infra at 48-50, the district court takes pains to ensure that _____ the contents of the illegally intercepted conversations, and any evidence derived therefrom, are not used or disclosed in the course of that litigation (other than in the course of making admissibility determinations), we do not believe that plaintiffs' concern will come to fruition. -45- 45 allowing for certain exceptions (i.e., an impeachment exception in criminal cases, see supra at 40-41, and an ___ _____ "adjudication" exception, see supra at 37-39, in all cases). ___ _____ In our view, the court's injunction is consistent with this statutory nuance. Accordingly, we reject plaintiffs' assertion that the court's failure to enjoin Bowers was infected by legal ______ error. c. Erroneous Exclusive Reliance on Section 2515 c. Erroneous Exclusive Reliance on Section 2515 ________________________________________________ The final facet of plaintiffs' argument, that the court erroneously thought itself restricted to the relief provided for in 18 U.S.C. 2515, see supra note 32, when it ___ _____ declined to enjoin Bowers, does not require extended ______ discussion. While, as we shall discuss below, the court did reveal a somewhat cramped view of the scope of its equitable powers in denying plaintiffs' Fed. R. Civ. P. 59(e) motion to amend judgment, see infra at 48-49, the record clearly ___ _____ reveals that no such restrictive view impaired its treatment of plaintiffs' initial request for injunctive relief. In fact, contrary to plaintiffs' contention, the court's injunction order explicitly states that the decision not to enjoin Bowers was based upon the evidence, and not upon a ______ perceived lack of legal power to order the remedy requested. -46- 46 See Poulos II, slip op. at 30 ("The Court is satisfied that ___ _________ the injunctive relief sought is beyond the scope warranted by __ the evidence presented at trial.") (emphasis supplied). ___ ________ _________ __ _____ Accordingly, we find this claim of legal error to be without merit. 2. Motion to Amend Judgment 2. Motion to Amend Judgment ____________________________ Plaintiffs next argue that the district court erred in denying their Fed. R. Civ. P. 59(e) motion to amend judgment. In this motion, plaintiffs averred that they were seeking, inter alia, to "clarify" the court's previous _____ ____ injunction order. In reality, however, as the district court noted, plaintiffs' motion actually sought (1) "additional relief" not requested at trial or in the amended complaint, and (2) evidentiary rulings in Bowers. Because the court ______ acted well within its discretion in denying this relief, we cannot agree with plaintiffs that the court erred in denying their motion. Because, however, we do agree with plaintiffs that the court's denial order evinced a misunderstanding of (1) the scope of its powers, and (2) the requirements of Title III, we do pause, albeit briefly, to add a few caveats. _______ The decision to grant or deny a Rule 59 motion is committed to the wide discretion of the district court and must be respected absent abuse. E.g., Fernandez v. Leonard, ____ _________ _______ 963 F.2d 459, 468 (1st Cir. 1992). Of course, this discretion attaches to a court's decision on whether to allow -47- 47 a party to argue new material or a new theory under Rule 59. See Appeal of Sun Pipe Line Co., 831 F.2d 22, 25 (1st Cir. ___ ____________________________ 1987), cert. denied, 486 U.S. 1055 (1988); but see FDIC v. _____ ______ ___ ___ ____ Meyer, 781 F.2d 1260, 1268 (7th Cir. 1986) (motion to alter _____ or amend judgment "cannot be used to raise arguments which ______ could, and should, have been made before the judgment issued") (emphasis supplied). Here, plaintiffs' Rule 59 motion sought relief not requested in their amended complaint. For example, plaintiffs asked the court to order, inter alia, (1) that _____ ____ defendants "turn over for seal or destruction every illegal tape and transcript, and any record of any sort containing any contents of illegal interceptions"; (2) that the Poulos defendants and Daniel Lilley and his law firm42 be enjoined from further participation in Bowers; (3) that the ______ aforementioned attorneys be prohibited from communicating with whatever attorney/s might replace them as counsel in Bowers; (4) that the disclosure and/or use of depositions ______ taken by Poulos be enjoined; and (5) that defendants with exposure to the intercepted recordings be prohibited from testifying in Bowers. In their complaint, however, ______ plaintiffs requested no such relief as an alternative to the enjoining of Bowers. Accordingly, insofar as the court ______ ____________________ 42. Mr. Lilley has represented the CAR defendants throughout this litigation. -48- 48 denied plaintiffs' motion because the motion sought "additional relief", we cannot say that it abused its discretion.43 Nevertheless, we are concerned about certain dicta contained in the district court's order. In the course of denying plaintiffs' Rule 59 motion, the court indicated (1) that 18 U.S.C. 2515, see supra note 32, and (2) the ___ _____ independent source rule, see supra note 38, would constrain ___ _____ its rulings in Bowers. We think that the court erred in so ______ indicating. First, we wish to emphasize that, as always, the court has broad discretion, through discovery orders, evidentiary rulings, and the like, in deciding how it will manage that trial. See, e.g., Serrano-Perez v. FMC Corp., ___ ____ _____________ _________ 985 F.2d 625, 628 (1st Cir. 1993) (district court has broad discretion in managing litigation). However, in Bowers, this ______ discretion must be tempered by the court's obligation, flowing from the protections set forth in Title III and the Maine act, to ensure that the illegally intercepted material, and any evidence derived therefrom, not be disclosed or used in that proceeding (other than for the purposes we have already approved, see supra section III.B.1.a. of this ___ _____ opinion). In our view, this discretion and concomitant obligation will require the court to consider the possibility ____________________ 43. Similarly, we cannot say that the court abused its discretion in deferring the making of evidentiary rulings in Bowers. ______ -49- 49 of rulings that go beyond 2515, which is directed solely at evidence. For example, in order to guard against the future use of the intercepted material, as the term use is generally understood, we believe that the court should consider matters such as (1) the disqualification of counsel, and (2) the prohibition of any communication between any disqualified counsel and replacement counsel. This leads to our second point. In making its rulings, the court should be aware that, as a general rule, Fourth Amendment doctrines like the independent source rule do not apply in private civil actions implicating Title III. As the Supreme Court has stated: The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's private life. That wrong . . . is fully accomplished by the original search without probable cause. United States v. Calandra, 414 U.S. 338, 354 (1974) (allowing _____________ ________ a grand jury witness to be asked questions based on evidence obtained in violation of Fourth Amendment, because such questions "work no new Fourth Amendment wrong"). Title III, on the other hand, generally proscribes, inter alia, the disclosure and/or use of illegally _____ ____ intercepted material. In other words, it prohibits more than ____ just the initial wrongful invasion. See Gelbard, 408 U.S. at ___ _______ -50- 50 51-52. Thus, under Title III, the disclosure and/or use of information obtained through a wrongful invasion amounts to a separate injury prohibited by statute, and makes a person subjected to such a disclosure and/or use "a victim, once again, of a federal crime." Id. at 52 (ruling that grand ___ jury witness may not be asked questions based on evidence ___ obtained by illegal wiretapping). In sum, the court did not abuse its considerable discretion in denying plaintiffs' Rule 59 motion. However, in making discovery, evidentiary, or other rulings in Bowers, ______ the court should not (1) assume that it is limited to the relief set forth in 2515, or (2) assume the applicability of judicially developed Fourth Amendment jurisprudence. 3. Statutory Damages 3. Statutory Damages _____________________ Plaintiffs' third argument is that the court erred in determining that the statutory damages provided for in 18 U.S.C. 2520(c), see supra note 5, are legal, rather than ___ _____ equitable, in nature. Defendants respond that plaintiffs did not preserve this argument for appellate review. We agree with defendants that this issue is not properly preserved. As noted earlier, see supra note 21, plaintiffs' ___ _____ original complaint sought declaratory and injunctive relief; actual, statutory, and punitive damages; and attorneys' fees. As the trial date approached, however, plaintiffs apparently determined that they did not wish to have a jury hear any -51- 51 portion of this case. Accordingly, they amended their complaint so as to drop all but their statutory damages claims. Then, in their final pretrial memorandum, plaintiffs stated: "If the Court should decide that statutory damages are a legal remedy so as to support the Defendants' jury demand, then the Allied Plaintiffs will dismiss their claim for statutory damages." Subsequently, the court ruled that statutory damages are legal in nature. Thus, plaintiffs further amended their complaint so as to omit their prayer for statutory damages. Plaintiffs now seek to resurrect their statutory damages claim. This they cannot do. If plaintiffs wished to preserve this issue, they should have presented their case for statutory damages to a jury. Cf., e.g., Foley v. City of ___ ____ _____ _______ Lowell, 948 F.2d 10, 22 (1st Cir. 1991) ("`It is black letter ______ law that it is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal.'") (quoting Beaulieu v. ________ IRS, 865 F.2d 1351, 1352 (1st Cir. 1989)). If they were ___ displeased with the results of the jury's deliberations, plaintiffs next could have asked the court to set the jury's determination aside. If they still were not satisfied, plaintiffs then could have appealed the court's decision to commit the statutory damages question to the jury in the first instance. -52- 52 Plaintiffs' approach to this issue, if endorsed, would undermine the efficient administration of justice. Had plaintiffs presented their claim for statutory damages to a jury, and had they received the award they sought (either from the jury itself or from the court after a successful Rule 50 motion for judgment as a matter of law), the need for an appeal on this point would have been obviated. Moreover, even if plaintiffs had not received the relief they were seeking, the issues underlying the propriety of a statutory damage award would have been fully litigated at the same time as the other issues animating this litigation. Thus, we would have been in a position, on a developed record, either to resolve the question ourselves or to remand for what would undoubtedly be a less involved process than the one plaintiffs now seek. In sum, when plaintiffs amended their complaint so as to drop their claim for statutory damages, they irrevocably waived their right thereto. Accordingly, we need not reach the question of whether the court erred when it determined, prior to plaintiffs' final amendment, that statutory damages under 2520(c) are legal in nature. 4. Disclosure and Use Violations by the CAR Defendants 4. Disclosure and Use Violations by the CAR Defendants _______________________________________________________ Finally, in one-half of one page of their fifty-one page brief, plaintiffs contend that the district court committed legal error in ruling that the CAR defendants did -53- 53 not violate the disclosure and use provisions of Title III and the Maine act. The CAR defendants, utilizing just over three-quarters of one page of their forty-eight page brief, counter that any disclosures and uses on their part took place within the confines of the attorney-client relationship, and that such fact absolves them from liability under the relevant statutory provisions. Plaintiffs, again using less than one-half of one page of their forty-eight page reply brief, characterize this argument as "incomprehensible" and restate their position that the CAR defendants committed disclosure and use violations. Neither side, at any point, makes reference to any case law, statutory authority, or legislative history. The issue here adverted to is an interesting one on which no federal appeals court has yet spoken: namely, do 18 U.S.C. 2511(c) and (d) (and, correspondingly, 15 M.R.S.A. 710(3)(A) and (B)), see supra note 3, which by their terms ___ _____ prohibit the "disclos[ure] . . . to any other person" and the "use" of illegally intercepted material, make it a crime to disclose and use such material during the course of attorney consultations?44 Certainly, reasonable arguments might be ____________________ 44. At least one federal judge, recognizing the inherent tension between the wording of the statute and the need for effective trial preparation, has held that the disclosure of the contents of intercepted recordings to counsel, for the ___ ___ purpose of preparing a defense, is not a crime. See McQuade _______ __ _________ _ _______ ___ _______ v. Michael Gassner Mech. & Elec. Contractors, Inc., 587 F. _________________________________________________ Supp. 1183, 1188-89 (D. Conn. 1984) (Cabranes, J.); see also ___ ____ -54- 54 made on both sides of this question of first impression. And, in accordance with our usual practice, we do not wish to decide it without the benefit of such argumentation and a developed record. Accordingly, we deem the issue to have been waived in this instance. See Innamorati, 996 F.2d at ___ __________ 468. IV. IV. ___ CONCLUSION CONCLUSION __________ For the reasons herein stated, we affirm the district court in all respects. Affirmed. No costs. Affirmed. No costs. ________ ________ ____________________ Sound Unlimited, Inc. v. Video Shack Inc., 661 F. Supp. 1482, _____________________ ________________ 1488 (N.D. Ill. 1987) (alluding to but not deciding issue); cf. supra at 37-39 (disclosures and uses for purposes of ___ _____ adjudication not banned by Title III). -55- 55